## HAYFIELD NORTHERN RAILROAD CO., INC., ET AL. *v.* CHICAGO & NORTH WESTERN TRANSPORTATION CO.

No. 82–1579.   Argued February 21, 1984—Decided June 12, 1984

*Robert S. Abdalian* argued the cause for appellants. With him on the briefs were *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Gilbert S. Buffington*, Special Assistant Attorney General.

*Mark I. Levy* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee* and *Deputy Solicitor General Bator*.

*Anne E. Keating* argued the cause for appellee. With her on the brief was *Thomas E. Glennon*.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Arkansas et al. by *Bronson C. La Follette*, Attorney General of Wisconsin,

Justice Marshall delivered the opinion of the Court.

The Staggers Rail Act of 1980, which amended the Interstate Commerce Act,[1] regulates the process by which rail carriers may abandon unprofitable lines and provides a mechanism for shippers to obtain continued service by purchasing lines or subsidizing their operation. This case poses the question whether the Interstate Commerce Act, as amended, pre-empts a Minnesota eminent domain statute[2] used to condemn rail property after it has been abandoned pursuant to the amendments. The Court of Appeals for the Eighth Circuit held that the Act, as amended, pre-empted the state statute. 693 F. 2d 819 (1982). We disagree.

## I

On January 30, 1981, appellee filed an application with the Interstate Commerce Commission (Commission) seeking permission to abandon a 44-mile rail line between Oelwein, Iowa, and Randolph, Minn. Appellee maintained that operation of the line imposed a serious financial strain on its resources. Several shippers in Minnesota (Shippers Group) opposed the abandonment of a 19.2-mile segment of the line that passed through Hayfield, Minn. (Hayfield segment). After an Administrative Law Judge ruled that appellee was entitled to abandon the entire 44-mile line, the Shippers Group, pursu-

---

*Charles D. Hoornstra*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Steve Clark* of Arkansas, *Charles M. Oberly III* of Delaware, *Jim Jones* of Idaho, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *Frank J. Kelley* of Michigan, *Erwin I. Kimmelman* of New Jersey, *Robert O. Wefald* of North Dakota, *Dave Frohnmayer* of Oregon, *LeRoy S. Zimmerman* of Pennsylvania, *T. Travis Medlock* of South Carolina, *John Eaton, Jr.*, of Vermont, *Kenneth O. Eikenberry* of Washington, and *A. G. McClintock* of Wyoming.

[1] Pub. L. 96–448, § 402, 94 Stat. 1941–1945, 49 U. S. C. §§ 10903–10906.

[2] Minn. Stat. § 222.27 (1982); *infra*, at 631 (quoting the text of the law). Many States have enacted similar statutes. See Brief for Appellants 5, n. 2 (citing statutes in 33 States).

ant to the Staggers Rail Act amendments, offered to subsidize operation of the Hayfield segment. See 49 U. S. C. § 10905(c).[3] When the parties could not agree on mutually acceptable terms, the Commission, at the request of the Shippers Group, determined the appropriate price for subsidizing continued operation of the line. See 49 U. S. C. § 10905(e). Dissatisfied with the Commission's determination, the Shippers Group withdrew its offer. See 49 U. S. C. § 10905(f)(2). Soon thereafter, the Commission granted a certificate of abandonment to appellee, *ibid.*, thereby relieving appellee of its federal obligation to supply rail service.

During the period that the Shippers Group was attempting to prevent the issuance of a certificate of abandonment, appellee entered into contracts with the State of Iowa and various Iowa shippers. These contracts involved improvements of certain trackage in Iowa. Appellee intended to fulfill these contracts by using the track from the abandoned line.

On March 31, 1982, members of the Shippers Group formed appellant Hayfield Northern Railroad Co., Inc. (hereafter appellant). Appellant planned to use the eminent domain authority vested in it by Minn. Stat. § 227.27 (1982) to condemn the Hayfield segment that appellee had abandoned. Appellant filed suit in state court and obtained a temporary restraining order preventing appellee from removing track from the Hayfield segment. Appellee immediately removed the suit to Federal District Court and moved to dissolve the restraining order on the ground that the Act, as amended, pre-empted the Minnesota condemnation statute. At this point, the State of Minnesota intervened in order to defend appellant's application of its condemnation law.

---

[3] At the same time that the Shippers Group offered to subsidize continued rail service, it also appealed the decision authorizing abandonment. The Commission denied the appeal whereupon the Shippers Group filed a petition for review in the Court of Appeals. After unsuccessfully seeking a stay of the order permitting abandonment, the Shippers Group withdrew its petition for review. See 693 F. 2d. 819, 820 (1982).

The District Court awarded summary judgment to appellee and dissolved the restraining order. After granting a stay pending appeal, the Court of Appeals for the Eighth Circuit affirmed. 693 F. 2d 819 (1982). The Court of Appeals held that the Minnesota condemnation statute was pre-empted because it constituted an obstacle to the accomplishment of the congressional purpose behind the federal abandonment procedure. The Court of Appeals also dissolved its stay and remanded the case to the District Court for calculation of the damages incurred by appellee because of the delay. Following denial of rehearing by the Court of Appeals, we denied appellant's motion to stay the issuance of the Court of Appeals' mandate, 460 U. S. 1018 (1983), and subsequently noted probable jurisdiction, 464 U. S. 812 (1983).

## II

Pre-emption doctrine stems from the Supremacy Clause of the United States Constitution[4] and invalidates any state law that contradicts or interferes with an Act of Congress. Pre-emption arises in a wide array of contexts, from circumstances in which federal and state laws are plainly contradictory to those in which the incompatibility between state and federal laws is discernible only through inference.[5] This case presents no issue of express pre-emption; nothing on the face of the Staggers Rail Act amendments explictly indicates

---

[4] See U. S. Const., Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance therof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding"); *Gibbons* v. *Ogden*, 9 Wheat. 1, 211 (1824).

[5] Compare *McDermott* v. *Wisconsin*, 228 U. S. 115 (1913) (invalidating state law directly conflicting with federal regulations), with *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274 (1971) (holding wrongful discharge action brought in state court precluded by pervasiveness of federal regulation in the area). See generally L. Tribe, American Constitutional Law 376–391 (1978).

whether Congress intended to pre-empt state authority over rail property after the Commission has authorized its abandonment.  Therefore, in order to determine whether pre-emption is otherwise indicated, we must inquire more deeply into the intention of Congress and the scope of the pertinent state legislation.  We turn, then, to the laws in dispute to ascertain their structure and purpose.

Initially, the Interstate Commerce Act did not subject railroad abandonments to the jurisdiction of the Commission. See Act of Feb. 4, 1887, ch. 104, 24 Stat. 379.  Congress ceded authority over abandonments to the Commission in the Transportation Act of 1920, ch. 91, § 402(18)–(22), 41 Stat. 477–478.  See *Chicago & N. W. Transportation Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 319–320 (1981).  The Transportation Act prohibited a carrier from abandoning any portion of a line without first obtaining from the Commission a certificate of abandonment verifying that the future public convenience and necessity permitted the cessation of the carrier's rail service.

The abandonment procedure proved inadequate, however, because it lacked a specific timetable for the issuance of an abandonment certificate.  Railroads consequently found themselves enmeshed in lengthy proceedings before the Commission, unable to unburden themselves promptly of unprofitable lines.  See *Chicago & N. W. Transportation Co.* v. *United States*, 582 F. 2d 1043, 1045–1046 (CA7), cert. denied, 439 U. S. 1039 (1978); S. Rep. No. 94–499, p. 3 (1975).  Congress enacted new legislation to provide railroads with a more expeditious abandonment process that would also be attentive to the interests of shippers and others who might be dependent upon the continuation of rail service on a particular line.  See the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), Pub. L. 94–210, § 802, 90 Stat. 127, originally codified at 49 U. S. C. § 1a (1976 ed.) (subsequently recodified without substantive change at 49 U. S. C. § 10903 *et seq.*).

To alleviate the costly delays imposed upon railroads by protracted proceedings before the Commission, the 4–R Act provided a schedule to govern the abandonment process. See 49 U. S. C. §§ 1a(3), (4) (1976 ed.). At the same time, to afford opponents of an abandonment an opportunity to maintain rail service, the 4–R Act allowed abandonment to be delayed for up to six months if a financially responsible person offered to subsidize or purchase the line. § 1a(6)(a). It soon became clear, however, that further reforms would be required in order adequately to address both the need of railroads for an even more abbreviated method of abandonment and the need of shippers and communities to avoid the dislocations caused by abandonment.[6] As a consequence, Congress further amended the Interstate Commerce Act by enacting the Staggers Rail Act of 1980, Pub. L. 96–448, § 402, 94 Stat. 1941–1945, codified at 49 U. S. C. §§ 10903–10906.

The Staggers Rail Act amendment most pertinent to this case was the revision of § 10905. Entitled "Offers of financial assistance to avoid abandonment and discontinuance," § 10905 governs the procedures to be followed when a person seeks to prevent an abandonment by purchasing the carrier's lines or by subsidizing the carrier's service. Section 10905 provides that the Commission shall publish in the Federal Register its findings that the public convenience and necessity require or permit abandonment or discontinuance of a particular railroad line and that "[w]ithin 10 days following the publication, any person may offer to pay the carrier

---

[6] See generally Railroad Transportation Policy Act of 1979: Hearings on S. 1946 before the Senate Committee on Commerce, Science, and Transportation, 96th Cong., 1st Sess. (1979); Railroad Deregulation Act of 1979: Hearings on H. R. 4570 before the Subcommittee on Transportation and Commerce of the House Committee on Interstate and Foreign Commerce, 96th Cong., 1st Sess (1979); Railroad Deregulation Act of 1979: Hearings on S. 796 before the Subcommittee on Surface Transportation of the Senate Committee on Commerce, Science, and Transportation, 96th Cong., 1st Sess., pts. 1, 3 (1979).

a subsidy or offer to purchase the line." 49 U. S. C. § 10905(c).[7] If the Commission finds within 15 days that the offeror is "a financially responsible person (including a government authority)" and that the offer of assistance meets prescribed standards, it "shall postpone the issuance of a certificate authorizing abandonment or discontinuance." § 10905(d). If the offeror and the carrier "fail to agree on the amount or terms of the subsidy or purchase, either party may, within 30 days after the offer is made, request that the Commission establish the conditions and amount of compensation . . . within 60 days," § 10905(e), and this decision "shall be binding on both parties, except that the person who has offered to subsidize or purchase the line may withdraw his offer within 10 days of the Commission's decision." § 10905(f)(2). If the offer is withdrawn, "the Commission shall immediately issue a certificate authorizing the abandonment or discontinuance." *Ibid.*

The underlying rationale of § 10905 represents a continuation of Congress' efforts to accommodate the conflicting interests of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service.[8] Under the 4–R Act, carriers could negotiate with offerors in bad faith while simply waiting for the 6-month negotiating period to elapse. By pursuing this

---

[7] To enable potential offerors to determine the feasibility of subsidizing or purchasing a line, the Act mandates that a rail carrier applying for an abandonment certificate must provide current financial data, including an estimate of the annual subsidy and minimum purchase price needed to keep the line in operation. 49 U. S. C. § 10905(b).

[8] See S. Rep. No. 96–470, pp. 39–41 (1979) ("The abandonment provisions of this bill are designed to accomplish two major objectives: significantly reducing the time spent processing [abandonment] cases at the Commission and improving the process by which abandoned lines can be subsidized"); H. R. Conf. Rep. No. 96–1430, p. 125 (1980) (§ 10905 as amended will "assist shippers who are sincerely interested in improving rail service, while at the same time protecting carriers from protracted legal proceedings which are calculated merely to tediously extend the abandonment process").

course, carriers could either extract excessive prices from desperate shippers or abandon their lines without reaching an agreement on purchase or subsidy. See *Chicago & N. W. Transportation Co.* v. *United States,* 678 F. 2d 665, 667 (CA7 1982). To counteract bad-faith negotiating on the part of carriers, § 10905(f)(2) binds a carrier to the purchase or sub-sidy price determined by the Commission in the event that the offeror and the carrier cannot themselves come to terms. On the other hand, to reduce the costly delays associated with shipper opposition to proposed abandonments, § 10905 further abbreviates the period required for resolving negotiations over offers. Under the 4–R Act, the period for resolving such offers was six months; under § 402(c) of the Staggers Rail Act amendments, Congress reduced the period to 110 days.[9]

In contrast to the complicated structure of the Interstate Commerce Act, the Minnesota statute at issue is a straightforward application of a State's familiar power of eminent domain. The statute, originally enacted in 1879, provides:

"Every foreign and domestic railroad corporation shall have power to acquire, by purchase or condemnation, all necessary roadways, spur and side tracks, rights of way, depot grounds, yards, grounds for gravel pits, machine shops, warehouses, elevators, depots, station houses, and all other structures necessary or convenient for the use, operation, or enjoyment of the road, and may make with any other railroad company, such arrangements for the use of any portion of its tracks and roadbeds as it may deem necessary." Minn. Stat. § 222.27 (1982).

### III

The argument that the Staggers Rail Act amendments pre-empt the State's power of eminent domain over the abandoned Hayfield segment rests upon two contentions: first,

---

[9] Compare 49 U. S. C. § 1a(6)(a) (1976 ed.) with 49 ᵀᵀ §§ 10905(c)–(f).

that the federal regulation of railroad abandonments is so pervasive as to make reasonable the inference that Congress left no room for state action on this subject; and, second, that application of the Minnesota statute in the circumstances of this case would pose an obstacle to the accomplishment of the purposes of § 10905.

## A

The first contention attempts to bring this case within the narrow ambit of decisions in which this Court has indicated that congressional legislation so occupied the field of a particular subject area that state regulation within that field would be improper no matter how well state law comported with the federal policies involved. Cf. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U. S. 190, 203–204 (1983). This Court has repeatedly affirmed, however, that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons— either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U. S. 132, 142 (1963). In this case, Congress has *not* "unmistakably ordained" that the States may not exercise their traditional power of eminent domain over railroad property that has been abandoned; nothing in the Act expressly refers to federal pre-emption with respect to the disposition of abandoned railroad property. Nor is there any indication that the subject matter at issue here— abandoned railroad property—is of the sort that "permits no other conclusion" but that it is governed by federal and not state regulation. After all, state law normally governs the condemnation of ordinary real property.

Appellee insists that the line it abandoned cannot properly be viewed as ordinary real property because, even after abandonment has occurred, the line remains under the jurisdiction of the Commission. According to appellee, the elabo-

rate procedural detail of the Act indicates that in addition to granting the Commission exclusive and plenary authority to regulate abandonment, the Act also "granted the Commission exclusive and plenary authority to provide for continuation of rail service via forced sale or subsidy following its authorization of abandonment." Brief for Appellee 21–22. This claim reflects a misunderstanding of the Act. With exceptions irrelevant to this case,[10] the provisions of the Act relate to requirements that must be met *before* the Commission will authorize an abandonment. Therefore, unless the Commission attaches postabandonment conditions to a certificate of abandonment, the Commission's authorization of an abandonment brings its regulatory mission to an end.[11]

The proposition that, as a general matter, issuing a certificate of abandonment terminates the Commission's jurisdiction is strongly buttressed by the Commission's own

---

[10] See, *e. g.*, 49 U. S. C. § 10906:

"If the Commission finds that the rail properties proposed to be abandoned are suitable for public purposes, the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the Commission. The conditions may include a prohibition on any such disposal for a period of not more than 180 days after the effective date of the order, unless the properties have first been offered, on reasonable terms, for sale for public purposes."

See also 49 U. S. C. § 10905(f)(4) (no purchaser of an abandoned line "may transfer or discontinue service on such line prior to the end of the second year after consummation of the sale, nor may such purchaser transfer such line, except to the carrier from whom it was purchased, prior to the end of the fifth year after consummation of the sale").

[11] This does not mean that in the postabandonment period, States are free to undo the very purposes for which the Commission authorized an abandonment. For example, if the Commission authorized an abandonment on the ground that relocation of the track was essential to enable the carrier to provide adequate service elsewhere, pre-emption would almost certainly invalidate a subsequent order by a state court barring such a transfer. Cf. *In re Boston & Maine Corp.*, 596 F. 2d 2, 5–7 (CA1 1979); *Texas & Pac. R. Co. Abandonment between San Martine and Rock House in Culberson, Texas*, 363 I. C. C. 666, 678–679 (1980). This problem is absent from the case at bar.

interpretation of its regulatory authority. According to the Commission, "the disposition of rail property after an effective certificate of abandonment has been exercised is a matter beyond the scope of the Commission's jurisdiction, and within a State's reserved jurisdiction. Questions of title to, and disposition of, the property are the matters subject to State law." *Abandonment of Railroad Lines and Discontinuance of Service*, 365 I. C. C. 249, 261 (1981); see also *Chicago & N. W. Transportation Co.—Abandonment—in Waukesha, Jefferson and Dane Counties, WI*, I. C. C. Docket No. AB–1 (Sub-No. 144) (May 5, 1983) (set forth in App. to Joint Supplemental Memorandum of Appellant and Appellant-Intervenor A–1, A–5); *Common Carrier Status of States, State Agencies and Instrumentalities, and Political Subdivisions*, 363 I. C. C. 132, 135 (1980) ("When a rail line has been fully abandoned, it is no longer [a] rail line and the transfer of the line is not subject to our jurisdiction" (footnote omitted)), aff'd *sub nom. Simmons* v. *ICC*, 225 U. S. App. D. C. 84, 697 F. 2d 326 (1982); *Modern Handcraft, Inc.—Abandonment in Jackson County, Mo.*, 363 I. C. C. 969, 972 (1981). The Commission's position, of course, is entitled to considerable deference since it represents the construction of a regulatory statute by the agency charged with the statute's enforcement. See, *e. g., Bureau of Alcohol, Tobacco and Firearms* v. *Federal Labor Relations Authority*, 464 U. S. 89, 97 (1983).

B

The second contention in support of a finding of pre-emption is that the Minnesota condemnation statute, applied in the manner which appellant proposes, would obstruct the accomplishment of the objectives for which Congress enacted § 10905. Cf. *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) (pre-emption arises when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). More specifically, appellee maintains that if shippers are allowed to institute potentially

lengthy condemnation proceedings against abandoned rail lines, the benefits of the 110-day time limit established by § 10905 will be lost.[12]

We are unpersuaded. The expedited process provided by § 10905 was intended to abbreviate the period during which a carrier is obligated to furnish financially burdensome service it seeks to escape through abandonment. State condemnation proceedings do not interfere with that purpose insofar as such proceedings *follow* abandonment. After the Commission has authorized a carrier to abandon its lines, that carrier is relieved of its obligation to furnish rail service. Nothing in § 10905 indicates a federal interest in affording special protection to a carrier after the point at which the carrier's federal obligation ends.[13]

Appellee also maintains that allowing appellant to bring condemnation proceedings after abandonment would contravene the overall purpose of the Act: to make the railroad industry more efficient and productive. It is true that the exercise of state condemnation authority would prevent appellee from removing property subject to that authority from the Hayfield segment and shifting such property to higher-value uses elsewhere. It is also true that the existence of opportunity costs has been recognized by the Commission as one factor to be taken into account in deciding whether to authorize an abandonment. See, *e. g., State of Maine Dept. of Transportation* v. *ICC*, 587 F. 2d 541, 543–544 (CA1 1978). It does not follow however, that state condemnation authority thereby frustrates the federal abandonment scheme. What appellee overlooks is that § 10905 is

---

[12] According to the Court of Appeals "the benefits of the 110 day time schedule would be lost, since the state proceedings, once commenced, could take years." 693 F. 2d, at 822–823 (citation omitted).

[13] As the Conference Report on the Staggers Rail Act explained, one of the central aims of § 10905 was to "protec[t] carriers from protracted legal proceedings which are calculated merely to tediously extend *the abandonment process.*" H. R. Conf. Rep. No. 96–1430, p. 125 (1980) (emphasis added).

expressly designed to allow an offeror to *force* a carrier to forgo abandonment in favor of continued operation through subsidization or purchase, regardless of the opportunity costs entailed by the inability to shift its assets to higher-value uses. See § 10905(f)(2). Offerors must be willing, of course, to subsidize or purchase the line so that the costs of continued operation are lifted from the carrier. § 10905(d). But alleviating the carrier's burden does not alter the economic reality that opportunity costs continue to be incurred; it merely shifts the incidence of those costs. In light of Congress' imposition of solutions that subordinate opportunity costs to other considerations, state condemnation authority is not pre-empted merely because it may frustrate the economically optimal use of rail assets.

Finally, appellee maintains that appellant's proposed application of Minnesota law would interfere with the valuation procedure established by § 10905 by allowing appellant to relitigate the price the Commission established for the purchase or subsidizing of appellee's lines.[14] Although it may seem unfair to allow a shipper a "second bite at the apple" in state condemnation proceedings after it has participated in, and then withdrawn from, negotiations under § 10905, that second opportunity does not frustrate the purpose of the federal valuation scheme. That purpose was to prevent carriers from frustrating bona fide offers of subsidy or purchase through bad-faith negotiations, see *supra*, at 630–631, not to impose a blanket prohibition covering all postabandonment efforts to obtain abandoned property.[15]

---

[14] The Court of Appeals accepted this argument and concluded that allowing appellant to use Minnesota law to condemn the Hayfield segment "would circumvent the Commission's determination of value." 693 F. 2d, at 823.

[15] The question whether appellant should be allowed to litigate the value of appellee's abandoned rail property is an issue more appropriately analyzed in terms of res judicata rather than pre-emption. If an offeror participates in a § 10905 proceeding and obtains an unfavorable valuation, the Commission's administrative determination may well have preclusive

## IV

We hold that appellant's proposed application of Minnesota condemnation law is not pre-empted by the Staggers Act amendments to the Interstate Commerce Act. Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

---

effect in state condemnation proceedings. See, *e. g.*, *United States* v. *Utah Constr. & Mining Co.*, 384 U. S. 394, 422 (1966) (administrative determinations usually have res judicata effect "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate"). On the other hand, the 60-day limit within which the Commission must fix a price for purchase or subsidy, see 49 U. S. C. § 10905(f)(1)(A), may deprive the parties of the "adequate opportunity to litigate" required for the imposition of res judicata. We intimate no position on the issue inasmuch as it is not now before us.

Similarly, we leave open the issue whether state condemnation proceedings could, consistent with the purposes of the federal abandonment scheme, fix a lower valuation upon abandoned property than the valuation arrived at in prior § 10905 proceedings.