In re QUALITY SUPPLIER GENERAL PARTNERSHIP, and Samuel Richard Amoruso, Jr., Debtors.

The STATE OF MARYLAND, Movant,

v.

Samuel Richard AMORUSO, Jr., Respondent.

The STATE OF MARYLAND, Movant,

v.

QUALITY SUPPLIER GENERAL PARTNERSHIP, Respondent.

Bankruptcy Nos. 94–5–5532–SD, 94–5–5533–SD.

United States Bankruptcy Court, D. Maryland, at Baltimore.

Nov. 21, 1994.

Thomas C. Beach, III, Stephen F. Fruin, Whiteford, Taylor & Preston, Baltimore, MD, for debtors.

Douglas N. Silber, Asst. Atty. Gen., Baltimore, MD, Jay A. Shulman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, MD, for State of Maryland.

*MEMORANDUM OPINION MODIFYING AUTOMATIC STAYS*

E. STEPHEN DERBY, Bankruptcy Judge.

Debtors filed these cases under Chapter 11 of the Bankruptcy Code just prior to commencement of the hearing in a condemnation proceeding by the State of Maryland. The State's motion for relief from stay filed in each case requires the court to reconcile, in the context of a reorganization case, the State's exercise of its power of eminent domain with the automatic stay imposed by § 362(a) of the Bankruptcy Code upon the filing of the bankruptcy petition.

## I. Background Facts.

The State of Maryland has brought a proceeding for condemnation in the Circuit Court for Allegany County to take by eminent domain an improved parcel of real estate known as Lot 25 in the Celanese subdivision near Cumberland, Maryland. The State seeks to acquire Lot 25 as part of a much larger tract for the construction of a medium security penal institution to be known as the Western Correctional Institution (sometimes "WCI").

The debtor Samuel Richard Amoruso, Jr. ("Amoruso") was a named defendant in the condemnation proceeding, but the debtor Quality Supplier General Partnership ("Quality") was not. It is the State's position that Amoruso is an owner of Lot 25, that Quality was not the owner, and that Quality was not a necessary party to the condemnation proceeding. The bankruptcy schedules of each debtor, however, assert that, while Lot 25 is titled in the name of Amoruso, it is held in trust for the benefit of Quality. The schedules further disclose that Amoruso is a 65% owner and general partner of Quality.

Lot 25 is improved by a three story factory building in which debtors conduct businesses that include pallet manufacturing and repair, paper converting and recycling, and trucking. It is the last parcel sought to be acquired by the State in the Celanese subdivision for the WCI.

The State announced its selection of the Celanese site in mid-February, 1992. Through August, 1993, the State's representatives and Amoruso occasionally discussed possible purchase prices, but their respective opinions of fair value were so widely disparate that no agreement was forthcoming. In the Spring of 1992, the State's representative first suggested $110,000, and that summer the State made an offer of $215,000. Frank E. Bolton, Chief of Land Acquisition for the Maryland Department of General Services, testified that $350,000 was on the table between February and July, 1993, although Mr. Amoruso claimed he first learned of this higher offer from a newspaper article in August, 1993. Both Mr. Bolton and Mr. Amoruso agree that the State's last offer before the condemnation trial was $400,000, present-

ed in a letter dated August 23, 1993. Mr. Amoruso, on the other hand, mentioned that $3.2 million, later $2.6 million, would be necessary to replace Lot 25 and the factory building. As a result of the impasse, the State instituted condemnation proceedings in November, 1993.

The State has a pressing need for additional prison beds. The Deputy Commissioner of the Division of Corrections, Melanie C. Pereira, testified that the State has 20,844 inmates, but only 11,370 cells. The State's penal facilities are overcrowded; three institutions are operating under federal court orders; there is double celling; nonconventional housing is being utilized; and there have been several incidents at prison facilities that were attributable in whole or in part to overcrowding. Further, legislation passed in the last session of the General Assembly is expected to increase the number of inmates. For example, new legislation extends the date when a person who has been convicted of a violent crime becomes eligible for parole from 25% of sentence to 50% and increases to 10 years the mandatory, minimum term for persons convicted and incarcerated a second time for a crime of violence. 1994 Md. Acts, Ch. 716 §§ 2, 1. By March, 1996, when the first phase of the Western Correctional Institution is scheduled for completion, the State's need for additional beds will be critical in Commissioner Pereira's opinion.

In order to achieve the earliest, reasonable completion date for WCI, and to save money, the State awarded a demolition contract before it had title to, or possession of, the entire Celanese site. The State's representatives were confident that the State could reasonably rely on outside dates for taking possession of the last parcels because condemnation proceedings had been instituted and court dates set. In December, 1993 and early January, 1994, the State solicited bids for site demolition, hazardous material abatement, and rubble landfill. A contract was awarded to Coastal Energy, Inc., and the contract was approved by the Board of Public Works on January 26, 1994. Notice to proceed was given to the contractor on February 8, 1994, for an official starting date of February 9, 1994. The completion time for

the demolition and abatement work under the contract was 270 calendar days, *i.e.* November 5, 1994. Most of the site had been cleared by September 21, 1994, except for the Amoruso building on Lot 25.

Also in anticipation that it had outside dates for obtaining possession of the remaining parcels in the Celanese site, and to keep the WCI project moving to early completion, the State issued a construction bid invitation for sitework, utilities and perimeter security on May 19, 1994. The bid opening date was July 12, 1994, and the successful bidder was Bell BCI Co. A contract for $10,414,000 was approved by the Board of Public Works on July 27, 1994, but it was not immediately signed by the State.

During the pendency of these motions for relief from stay, however, on September 27, 1994 the authorized State official executed the Bell BCI contract. The explanation for this seemingly presumptuous action that was offered by David Bezanson, Deputy Secretary, Department of Public Safety and Correctional Services, was that he saw no reason for the State not to sign the Bell BCI Co. contract. Nevertheless, no notice to proceed had been given to the contractor as of the final hearing in this matter.

A jury trial in the condemnation proceeding was specially set for Monday, August 29, 1994 at 9:30 a.m. in the Circuit Court for Allegany County. The trial date was set in a circuit court Scheduling Order dated June 13, 1994 that had granted defendants' motion to continue. The Scheduling Order specifically provided that "Objections to this [trial] date must be made to the undersigned Judge within 30 days of the date of this order." Further, the Scheduling Order established the date by which the defendants were to vacate the premises: "In consideration of the continuance having been granted at Defendants' request, Defendants shall vacate the subject premises not later than September 18, 1994."

On the afternoon of Friday, August 26, 1994 debtors filed these reorganization cases. Monday morning, August 29, 1994 the State filed motions in each case requesting relief from stay and abstention to permit the condemnation trial to proceed and to enforce the Scheduling Order provision that would allow the State to take possession of Lot 25 no later than September 18, 1994. After an expedited hearing on August 30, 1994, this court modified the automatic stay in the Amoruso case to allow the condemnation trial to proceed. The issues of whether the stay should be lifted to allow the State to take title to, and possession of, Lot 25 were reserved for the final hearing on the motion. The condemnation trial proceeded, and an Order dated September 7, 1994 was entered by the Circuit Court for Allegany County on the jury's inquisition that just compensation had been determined to be $660,000. The jury's award was 65% higher than the State's final offer of $400,000 a year earlier.

This court denied expedited relief in Quality's case because Quality had not been named as a party in the condemnation proceeding. The State had alleged in its lift stay motion that Amoruso was the owner and that Quality was not a necessary party. Consequently, no grounds for expedited relief had been stated.

Lot 25 is well-suited for Quality's pallet manufacturing and repair operations and its warehouse. The property has adequate inside and outside storage for materials, pallets and trailers, as well as many truck bays of adequate size. The location is close to Quality's customer base. The facility is owned free and clear, so that debtors have not been required to make either lease or mortgage payments.

Amoruso has been looking unsuccessfully since 1991 for a comparable replacement facility. He has searched the area within 120 miles of Allegany County, although he would prefer to remain in Allegany County because of its proximity to Quality's customer base in Pittsburgh. Debtors' other facility in nearby Keyser, West Virginia, has limited unused space. Quality has 86 to 92 employees. The perfect new facility would be an approximately 150,000 square foot building located on about four acres for storing trailers; but Mr. Amoruso testified that he had not been able to locate a site he could afford, namely, one for about $2,000 per month. Quality's cash flow is already heavily encumbered with ne-

gotiated payments on tax arrearages to the Internal Revenue Service and to the states of Maryland and West Virginia that aggregate about $28,000 per month.

In the past month or so, Amoruso has engaged in preliminary discussions with the Allegany County Department of Economic Development about relocating to Building 26 at the Kelly–Springfield site. Building 26 is far from ready for occupancy. Only 4 of 15 truck bays are of adequate size. The roof has serious leaks. There is inadequate, outside storage available for Quality's needs. An old sprinkler system must be completely rebuilt and made functional. Individual electrical and water taps must be brought to the site from a distance of about 150 feet, and bathroom facilities must be provided. New electrical wiring in the building is required. Natural gas must be brought to the site to provide heated working areas. The City of Cumberland requires these basic amenities before it will issue an occupancy permit. A last impediment is that title cannot be conveyed to Building 26 until the site has been subdivided.

Amoruso has also identified the nearby Argyle Building in the Mexico Fuems Industrial Park to complement Building 26 for Quality's use. The Argyle Building has adequate space that could be improved for the outside storage that Quality needs. However, an existing tenant will not be vacating the building until December 31, 1994, and thereafter a new sprinkler system supported by a water tap into the building increased from 4 inches to 10 inches must be installed and additional dock doors must be added before Quality could occupy the building.

There have not been any negotiations by Debtor as to financial terms for either the Kelly–Springfield Building 26 or the Argyle Building sites. The initial proposal by the Department of Economic Development for Building 26 was a multiple of what Amoruso testified debtors could afford to pay. Amoruso has only obtained the asking terms for the Argyle Building. Additionally, the debtors have offered no suggestion how they could afford to finance the necessary improvements. Amoruso estimates at the most optimistic that everything could be accom-

plished in seven months, namely, by the end of May, 1995. Debtors formally ask that they be protected by the automatic stay until the end of July, 1995, as a more practical relocation deadline.

The court concludes that at this stage the debtors' relocation plans and prospects for achieving them are no more than guesses and hopes. There is no reasonable prospect that Quality's business could be relocated successfully within seven months, nine months or any other defined period. The timing and conditions for governmental approvals are uncertain; the results of lease or acquisition negotiations are unknown; and financing is speculative. Debtors have not been able to define Quality's relocation prospects, although they have known for over two years that Quality's business would be forced to move by the State's announced plans. While the State's purchase offers appear to have been low based on the jury's determination of fair market value, and while the failure to finalize a purchase price may have impeded final relocation commitments, the State's actions do not justify the debtors' failure to make more progress to develop relocation alternatives.

The State has presented evidence that its costs will be increased if its access to Lot 25 is delayed, and that the anticipated March, 1996 completion date for this phase of WCI will not be met if the State does not have access by December 1, 1994. Although the evidence establishes that withholding access to Lot 25 from the State will cause disruption and increased contractor claims, and that claims are likely to increase with the length of delay, the State's attempt to quantify costs attributable to such delay was too speculative to provide a reasonable basis for a finding of fact. Nevertheless, the court finds that the utility contractor, Bell BCI Co., will not reach Lot 25 until 90 days after the State issues its notice to proceed. Further, after the State is given access to the Lot 25, Steven DeGarmo, the WCI project manager, estimates it will take 60 days to clear the debtors' factory building and prepare Lot 25 for utility work by Bell BCI Co. This estimate includes 30 days for inspection, testing, remobilization and anticipated asbestos

abatement, and 30 days to demolish the factory building and ready the site. Without a firm access date in the near future, there may also be costly remobilization required for the heavy demolition equipment at the site. Finally, the State's decision to incorporate Lot 25 into its construction plans for the first stage of WCI was reasonable and cost effective.

## II. Conclusions of Law.

■ The automatic stay of 11 U.S.C. § 362(a) is applicable to enjoin the State's exercise of its power of eminent domain as to property of the debtors. *Cf., In re Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of City of New Hampton, Iowa,* 738 F.2d 209, 211–12 (7th Cir.1984) (decided under the railroad reorganization provisions of the Bankruptcy Act). The district court has "... exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such [bankruptcy] case, and of property of the estate." 28 U.S.C. § 1334(d). Pursuant to 28 U.S.C. § 157(a), the exercise of this jurisdiction has been referred to by the U.S. District Court for the District of Maryland to this Bankruptcy Court. D. of Md. Rule 402. The exclusive jurisdiction exercised by the Bankruptcy Court over the debtors' property preempts the jurisdiction of the State courts by virtue of the Bankruptcy and Supremacy Clauses of the United States Constitution. U.S. Const., Art. I, § 8, cl. 4 and Art. VI, cl. 2. Therefore, during the pendency of these bankruptcy cases, the State must obtain relief from the automatic stay before it may proceed further to exercise its power of eminent domain to condemn Lot 25.

■ Debtors may not, however, permanently bar the State from exercising its power of eminent domain over their property through the expedient of a confirmed reorganization plan. Assuming the debtors were successful in having a reorganization plan confirmed, the federal interest of the bankruptcy court in protecting debtors' opportunity to reorganize would fade upon confirmation. "Except as otherwise provided ..., the confirmation of the plan vests all of the property of the estate in the debtor". 11 U.S.C. § 1141(b). When a bankruptcy estate's property is revested in a debtor after confirmation of a reorganization plan, the debtor's property interests stand in the same relationship to the State's sovereign powers of eminent domain as they did before bankruptcy, and in the same relationship as the ownership rights of other property owners. Debtors never possessed rights in Lot 25 that were superior to the eminent domain powers of the State. Debtors do not have, and they never had, the power to convey property free of the State's eminent domain powers, nor do debtors have the power to subordinate the State's sovereign rights.

The juxtaposition of a State's eminent domain powers and a debtor's reorganization, again under the railroad reorganization provisions of the Bankruptcy Act, was articulated in *Commonwealth v. Bartlett,* 384 F.2d 819, 822 (1st Cir.1967).

> Rather, it [the state] possesses a special inchoate interest or right, which is paramount to any interest of the debtor in the property. This is nothing the debtor ever had, or that it, or the court, could convey, qualify, or subordinate to any other claim or interest. There is, as we held in the *New Haven* case, not even a bankruptcy function to determine fair compensation. In sum, with respect to the state's prescriptive rights the court could effect none of the alterations or take any of the actions ordinarily contemplated in a reorganization proceeding. At the most, it could order the state not to proceed. Moreover, the prohibition would be no more than a postponement. The moment the court relinquishes jurisdiction its power is terminated; there can be no prospective prevention. Accordingly, if the state must apply to the court, and the court were to conclude that the proposed exercise of eminent domain would cripple the reorganization, the lethal blow may be diverted from the egg, but it will fall upon the day-old chick at the state's pleasure.

Cited with approval in *Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of State of Wisconsin Department of Transportation,* 739 F.2d 1169, 1174 (7th Cir.1984).

■ The State's motion for relief from stay, however, presents the intermediate issue of what standard the bankruptcy court should utilize during the pendency of a reorganization case to weigh a debtor's right to reorganize and a state's sovereign right of eminent domain. The court concludes that a balancing of interests should be used to determine whether relief from the automatic stay should be granted. The federal interest in protecting a debtor's right to reorganize should prevail, if it can be accommodated without doing substantial harm to the state's interests in pursuing condemnation of a debtor's property.

■ If a property is not necessary for debtor's effective reorganization, on the other hand, the state should be allowed to proceed with its condemnation. By analogy to the standard approved in *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740, 751 (1988), the debtor must show that "the property is essential for an effective reorganization *that is in prospect,*" that is, "that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" (Emphasis in the original.). Finally, where an irreconcilable conflict appears between a debtor's opportunity to reorganize and the public interest to be served by a state's exercise of its eminent domain powers, the debtor's reorganization must yield.

The principles enunciated in the two preceding paragraphs are drawn from the limited case law that has addressed how the conflicting interests of a debtor and a state should be resolved when a state seeks to condemn a debtor's property. In *Chicago, M., St. P. & Pac. Rwy. (City of New Hampton), supra,* the court affirmed an order of the reorganization court enjoining condemnation proceedings against the debtor's property by the City of New Hampton. The court explained that the bankruptcy court must determine whether to grant relief based upon whether the condemnation would infringe upon debtor's reorganization. It stated:

The reorganization court must make the determination in the first instance of whether the proposed proceeding would infringe upon the purposes of the reorgani-

zation and based upon that inquiry grant or deny relief from the stay.

738 F.2d at 212. Further, the court explained:

Relief from the stay should be granted if the condemnation would not in any way interfere with the operation of the railroad nor otherwise hamper the prospects for an effective reorganization, since the bankruptcy court's exclusive jurisdiction is for the purposes of the proceedings only and should not be extended beyond those purposes. However, the only orderly way to proceed, consistent with the concept. of exclusive jurisdiction, is to have the reorganization court determine in the first instance whether the condemnation proceeding would impair the purposes of the reorganization proceeding. It is the bankruptcy court which must in the first instance determine if precluding the condemnation would or would not enhance the prospects for an effective reorganization.

*Id.* at fn. 3. In conclusion, the court summarized:

We think the guiding principle should be to permit the exercise of the power of eminent domain to the greatest extent consistent with the purposes of the reorganization proceeding, but the reorganization court is to make the initial decision as to the appropriate accommodation between them.

*Id.* at 214.

In other words, if the bankruptcy court determines that the condemnation will not infringe upon a debtor's reorganization, relief from the stay should be granted to allow a state condemnation to proceed. In making this determination, the bankruptcy court should assure itself that a debtor's efforts at reorganization are sufficient to satisfy the purposes of the Bankruptcy Code and that the state is allowed to proceed to the greatest extent possible without materially infringing upon such a reorganization.

In the companion case of *Chicago, M., St. P. & Pac. Rwy. (Wisc.D.O.T.), supra,* the court illustrated these principles when it reversed an order denying leave to Wisconsin D.O.T. to condemn railroad property on

which debtor was abandoning service. The court reasoned that the condemnation would not interfere with debtor's prospects for an effective reorganization and that the Trustee's efforts to leverage a higher price for the property was not a proper reorganization reason to deny the state the right to take the property for public use.

The condemnation of the line upon abandonment will not in any way interfere with the rehabilitation of the Milwaukee Road as a functioning railroad. The federal interest in continued railroad operation has terminated. The Interstate Commerce Commission has recommended abandonment. The reorganization court has found abandonment appropriate and has authorized it. It does not appear that the actual taking of the property out of the debtor's estate would have an adverse impact on the prospects for an effective reorganization. The state's interest in the exercise of its power of eminent domain is only in collision with whatever interest the Trustee has in retaining the property or disposing of it otherwise.

739 F.2d at 1173–74.

The Constitution, however, mandates just compensation for private property taken for public use, and the judicial proceedings provided by the eminent domain law of Wisconsin are structured to guarantee that result. The state's right to take property for public use is an attribute of sovereignty, of great importance. We do not deem the possibility that the Trustee may obtain a higher price through negotiation [to be] a purpose of reorganization properly to be served by refusal to relax exclusive jurisdiction.

*Id.* at 1175.

Deference should be given to the state's sovereign power of eminent domain. As explained in the *Wisc.D.O.T.* case, *supra:*

Although the situations are different, we think the Supreme Court's decision in *Hayfield* [*Northern R.R. v. Chicago & N.W.,* 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984) ] generally supports the proposition that exercise of the state's power of eminent domain should not be readily found to conflict with the purposes of federal law.

739 F.2d at 1174, fn. 4. The court referred to *Commonwealth v. Bartlett, supra,* with approval on this point.

... we do think *Bartlett* correctly counsels deference to the state's eminent domain function.

*Id.* at 1174. One conclusion of *Bartlett,* however, is that if the conflict is not reconcilable, the state's sovereign powers must prevail. The *Bartlett* court concluded "... that it is the state's interest, and not that of a successful reorganization that must prevail if they are in conflict," although the court somewhat begrudingly stated that "[a]t the most" the bankruptcy court could postpone a state's condemnation if the bankruptcy "... court were to conclude that the proposed exercise of eminent domain would cripple the reorganization, ...." 384 F.2d at 822.

■ Applying these teachings in the instant case, there is a conflict between the state's need to take debtors' property for construction of WCI and debtors' stated effort to reorganize by relocating their businesses to an equally suitable and affordable facility. Debtors have not demonstrated that there is a reasonable possibility of a successful relocation that is in prospect within a reasonable time. The additional 8½ to 10½ months delay of the date set in the Scheduling Order of Allegany County Circuit Court for the State to take possession of Lot 25 that has been requested by debtors is in direct conflict with the State's eminent domain rights. The State is not obligated to amend the contract documents with its contractors to force such major revisions as suggested by debtors to reasonable and orderly construction schedules. Therefore, the State is entitled to some relief.

Amoruso testified debtors could move out in 90 days if they had a place to move within Allegany County. This testimony assumed an orderly move that kept business operations going throughout. However, since debtors do not presently have a suitable site within Allegany County, and it is speculative whether and when they will even have a site, this 90 day estimate does not point to a reasonable accommodation. Rather, Mr.

Amoruso's estimate of two weeks to relocate machines after a location is identified and a couple of weeks to move the paper are more relevant time periods that the State should accommodate, if reasonable. Further, although Amoruso testified that he had not looked for places to store machines, it appears debtors must consider storage as an alternative until an acceptable, new site is located.

The State does not need immediate possession of Lot 25. The utility contractor will not reach Lot 25 in its anticipated work sequence for 90 days after the State gives it notice to proceed. The State's contractors need only about 30 days to perform the anticipated asbestos removal and demolition work, provided they have a certain start day and can inspect and mobilize beforehand. Amoruso testified that to force debtors to move within a month would close debtors' doors. The State, however, is reasonably able to accommodate 60 days to allow debtors to move out in a more orderly manner, provided the State can perform preparatory activities during that period.

For these reasons, an order granting the State final relief from the automatic stay has been entered on the following terms:

1. Effective upon entry the stay was modified to permit the State and its authorized contractors to inspect Lot 25, to mobilize, to obtain necessary approvals, and to take all preliminary steps necessary to take title; and

2. Effective 60 days after the final hearing, final relief is granted to permit the State to exercise its full powers of eminent domain for all purposes with respect to Lot 25.

This Order confirmed the decision announced orally at the conclusion of the final hearing on October 28, 1994. Relief was granted as to Quality, as well as Amoruso, to allow the State to settle Quality's ownership claims and to exercise its eminent domain powers over Lot 25, in accordance with State law, with respect to both debtors as their interests may appear.