Public Utilities Commission
No. 99-794

APPEAL OF CONSERVATION LAW FOUNDATION

(New Hampshire Public Utilities Commission)

October 12, 2001

*Thomas F. Irwin*, of Concord, on the brief and orally, for the petitioner.

*Thomas I. Arnold, III*, deputy city solicitor, of Manchester, by brief and orally, for the respondent.

NADEAU, J. The petitioner, Conservation Law Foundation (CLF), appeals the New Hampshire Public Utilities Commission's (PUC) dismissal of its petition to preserve a portion of railroad line in Manchester. We affirm.

The following facts are supported by the record. In 1998, the respondent, City of Manchester (city), purchased a portion of the railroad line between Manchester and Lawrence, Massachusetts, in order to extend a runway at the Manchester Airport. As part of the runway expansion project, the railroad tracks were removed and portions of the right of way paved over. On May 20, 1999, CLF filed a petition requesting the PUC to: (1) conduct a public hearing, pursuant to RSA 365:24-a (1995), to determine whether removal of the tracks at the Manchester Airport was consistent with the public good; (2) find, following the public hearing, that removal of the tracks was not consistent with the public good; (3) prohibit further removal of the tracks and related equipment; and (4) order the city to restore and preserve the tracks for future railroad use.

While CLF's petition was pending, the federal surface transportation board (STB) granted the rail carrier, Boston and Maine Corporation (B&M), an exemption to abandon the portion of railroad line at issue. *See* 49 C.F.R. § 1152.50 (2000). On August 18, 1999, B&M gave notice that it had "fully abandoned the line as of August 4, 1999 by discontinuing operations on the line with the intent that the property be removed from the interstate rail network."

On September 27, 1999, the PUC dismissed CLF's petition, finding, among other things, that the PUC's jurisdiction under RSA 365:24-a was preempted by federal law. On appeal, CLF contends that the PUC has authority under RSA 365:24-a to conduct a public hearing to determine whether removal of railroad track is consistent with the public good. RSA 365:24-a provides in part:

> I. No person shall tear up and remove or cause to be torn and removed any railroad track, tie, switch, or diamond or any track-related structure, except for routine or emergency maintenance and replacement, from any railroad line, including but not limited to lines which are in active service, embargoed,

petitioned to be abandoned and abandoned, but excluding private spur, industrial, and storage tracks, without notice to the commission and such notice to the public as the commission may direct. Upon receipt of such notice, the commission shall conduct a public hearing to determine whether the proposed action is consistent with the public good, and may by order forbid the proposed action.

CLF challenges the PUC's determination that RSA 365:24-a is preempted by federal law. As a general proposition, federal preemption occurs in three instances:

First, Congress can define explicitly the extent to which its enactments pre-empt state law. . . .

Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . .

Finally, state law is pre-empted to the extent that it actually conflicts with federal law. . . .

*Tebbetts v. Ford Motor Co.*, 140 N.H. 203, 206 (1995) (quotation omitted), *cert. denied*, 516 U.S. 1072 (1996), *overruled on other grounds by Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000).

The PUC found RSA 365:24-a was preempted by the ICC Termination Act of 1995, which provides in relevant part:

(b) The jurisdiction of the [Surface Transportation] Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side

tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C.A. § 10501(b) (1997). The ICC Termination Act's expansive definition of transportation further broadens this preemption language:

"[T]ransportation" includes —

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . .

49 U.S.C.A. § 10102(9) (1997).

■ The first question before us, therefore, is whether RSA 365:24-a is preempted by this express language. It has been noted that "it is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Georgia Public Serv. Com'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). Focusing only upon the STB's jurisdiction over abandonment, CLF argues that preemption does not apply here because the abandonment of the railroad line has already taken place. Now that abandonment of the line has been completed, CLF argues, the STB no longer has jurisdiction over the railroad track. CLF relies upon *Hayfield Northern Railroad Co., Inc., et al. v. Chicago & North Western Transportation Co.*, 467 U.S. 622, 633 (1983), in which the Court stated that unless the Interstate Commerce Commission (the STB's predecessor) "attaches postabandonment conditions to a certificate of abandonment, the Commission's authorization of an abandonment brings its regulatory mission to an end."

We are not persuaded by CLF's argument. First, *Hayfield* was decided prior to the enactment of the ICC Termination Act, which broadened the preemption language of 49 U.S.C. § 10501. *Compare* 49 U.S.C. § 10501 (1995) (amended 1995, 1996) *with* 49 U.S.C.A. § 10501(b) (1997). "The statutory language and accompanying legislative record evidence Congress' clear and manifest intent to occupy the entire field of economic regulation of rail transportation ...." *Burlington Northern Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1296 (D. Mont. 1997). Thus, this comprehensive regulatory scheme goes beyond the abandonment of railroad lines.

Next, the state law enforced in *Hayfield* differs remarkably from that involved here, and we thus find *Hayfield* inapposite. In *Hayfield,* the carrier abandoned a portion of line after attempts by a group of shippers to subsidize operations pursuant to 49 U.S.C. § 10905 failed. *See Hayfield,* 467 U.S. at 625-26. The shippers, pursuant to state statute, then sought to exercise *eminent domain* over the abandoned line and prevent the carrier from removing track for use elsewhere. *See id.* at 626. As the Court noted, "[T]he Minnesota statute at issue is a straightforward application of a State's familiar power of eminent domain." *Id.* at 631. As such, the statute did not directly prohibit removal of track; it merely transferred ownership to an entity that did not want the track removed. *See id.* at 626. The Court discerned no "indication that the subject matter at issue here — abandoned railroad property — is of the sort that 'permits no other conclusion' but that it is governed by federal and not state regulation. After all, state law normally governs the condemnation of ordinary real property." *Id.* at 632.

Unlike the *eminent domain* statute in *Hayfield,* however, RSA 365:24-a does not determine ownership of abandoned railroad property. Rather, it regulates the *removal of railroad tracks* regardless of who owns them. *See* RSA 365:24-a. As its title indicates, the statute's purpose is the preservation of rail lines. *See id.* It was enacted as part of the Act that contained RSA 21-E:2 (repealed), which provided, in part: "The policy of the state of New Hampshire is to preserve for continued rail service or other public uses the line or lines of all railroads within the state, including, but not limited to, lines abandoned or to be abandoned in the state." Furthermore, RSA 365:24-a appears to target railroad lines likely to be used in interstate commerce, as it excludes from its coverage "private spur, industrial, and storage tracks." RSA 365:24-a.

Interstate commerce, however, is a federal concern. Thus, unlike the statute in *Hayfield,* RSA 365:24-a does not involve a traditional state power. *See Hayfield,* 467 U.S. at 632. Moreover, the applicable federal law is part of a comprehensive statutory scheme that addresses the same

policy that underlies RSA 365:24-a: the preservation of railroad lines and rights of way as required for the public good. Thus, 49 U.S.C.A. § 10903 (1997) provides that a carrier may abandon any portion of railroad line "only if the [STB] finds that the present or future public convenience and necessity require or permit the abandonment."

■ The federal statutory scheme also provides means for interested persons to maintain continued service on a railroad line proposed for abandonment or to preserve the line for future rail use. For instance, 49 U.S.C.A. § 10904 (1997) provides a mechanism by which any person may offer to either subsidize or buy a railroad line proposed to be abandoned. The statutory scheme also provides for the disposition for public purposes of rail properties sought to be abandoned if the STB finds that such properties "are appropriate for public purposes and not required for continued rail operations." 49 U.S.C.A. § 10905 (1997). In addition, federal law provides a mechanism for "rail banking," or holding railroad rights of way open for future rail use, by providing for their interim use as public recreational trails. *See National Wildlife Federation v. I.C.C.*, 850 F.2d 694, 697, 706 (D.C. Cir. 1988). The interim use statute notes that its provisions operate, in part, "in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C.A. § 1247(d) (2000). From this pervasive and comprehensive regulatory scheme, we infer that Congress intended the federal government to exclusively occupy the field of railroad regulation, including the preservation of railroad corridors for future rail use.

Our conclusion is reinforced by the policies underlying the ICC Termination Act, which include "to reduce regulatory barriers to entry into and exit from the [railroad] industry." 49 U.S.C.A. § 10101(7) (1997). The federal abandonment scheme is consistent with this policy in that it protects the carrier's financial interests when a third party is permitted to forestall abandonment by purchase or interim use. For instance, a sale pursuant to 49 U.S.C.A. § 10904 must be at an agreed price or a price determined by the STB that is at least fair market value. *See* 49 U.S.C.A. § 10904. Under 49 U.S.C.A. § 10904, an interim trail user of a right of way must assume full responsibility for its management and any legal liability and taxes, thereby "protecting the railroad interests from any liability or responsibility in the interim period." *National Wildlife Federation*, 850 F.2d at 701 n.10.

RSA 365:24-a conflicts with this policy by failing to compensate the carrier for loss of the ability to salvage or dispose of track. CLF argues that that application of RSA 365:24-a to a non-carrier, such as the city, does not conflict with Congress' purpose to protect railroad carriers' economic viability. We disagree. To the extent that the potential uses of real property affect its value, the inability of a purchaser of abandoned railroad property to remove track would tend to lower the property's sale price and thus its value to the selling carrier/owner.

We conclude that RSA 365:24-a is preempted, either explicitly or implicitly, by federal law. In light of this holding, we need not address CLF's remaining arguments.

*Affirmed.*

BROCK, C.J., and BRODERICK, DALIANIS and DUGGAN, JJ., concurred.