**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 27, 2005**

MICHIGAN DEPARTMENT OF NATURAL RESOURCES,

　　Plaintiff-Appellee and Cross-Appellant,

v　　　　　　　　　　　　　　　　　No. 124413

CARMODY-LAHTI REAL ESTATE, INC, a
MICHIGAN CORPORATION

　　Defendant-Appellant and Cross-Appellee.
_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

In 1873, the Quincy Mining Company conveyed an interest in real property located in Houghton County, Michigan, to the Mineral Range Railroad Company. The parties labeled this interest a "right of way" in the written deed. The precise nature of this right-of-way—whether it was an easement or a fee estate, whether it was limited to railroad purposes and, if so, what such a limitation would mean—is the subject matter of this appeal.

Plaintiff, the Michigan Department of Natural Resources, is the successor in interest of the Mineral

Range Railroad Company. It asserts that it owns a fee simple interest and is therefore entitled to use the right-of-way as a snowmobile and recreation trail. Defendant, Carmody-Lahti Real Estate, Inc., is the successor in interest of the Quincy Mining Company and maintains that plaintiff's predecessor in interest enjoyed only an easement, which it abandoned before purporting to convey it to plaintiff.

We conclude that the Court of Appeals correctly determined that the 1873 deed conveyed an easement rather than a fee simple. However, we conclude that the panel erred in holding that the easement was neither limited to a specific purpose nor abandoned by plaintiff's predecessor in interest. Properly construed, the instrument conveyed an easement for railroad purposes only. Thus, when plaintiff's predecessor in interest unambiguously manifested its intent to relinquish any use of the right-of-way for railroad purposes and took action consistent with that intent, the easement was abandoned. Defendant, as successor in interest to the original grantor, now has an unencumbered fee simple interest in the land formerly subject to the easement.

We therefore reverse the judgment of the Court of Appeals and remand to the circuit court for entry of summary disposition in defendant's favor.

2

# I. FACTS AND PROCEDURAL HISTORY

In 1873, Quincy Mining conveyed a "right of way" to Mineral Range through a written instrument that provided:

> This indenture made this twentyfirst day of October in the Year of Our Lord [1873] between the Quincy Mining Company . . . and The Mineral Range Railroad Company . . . witnesseth that [Quincy Mining] for and in consideration of the sum of one dollar to it in hand paid by [Mineral Range], the receipt whereof is hereby . . . acknowledged has granted, bargained, sold, remised, aliened and confirmed and by these presents does grant, bargain, sell, remise, release, alien and confirm unto [Mineral Range] its successors and assigns forever a right of way for the railroad of [Mineral Range] as already surveyed and located by the engineer of [Mineral Range] and according to the survey thereof on file in the Office of the Registrar of Deeds for the County of Houghton, Michigan to consist of a strip of land one hundred feet in width being fifty feet on each side of said surveyed line across the following described tracts or parcels of land situated in said county of Houghton: [describes parcels/plats].
>
> Also a right of way for said railroad surveyed and located as aforesaid and according to the survey thereof on file as aforesaid to consist of a strip of land one hundred feet in width being twenty feet in width on the north side of said surveyed line and eighty feet in width on the south side of said surveyed line across the tract or parcel of land known . . . as [describes parcels/ plats].
>
> Reserving to [Quincy Mining] and to its successors and assigns all ore and minerals on said strip of land and the right to mine the same from underneath the surface in such manner as not to interfere with the construction or operation of said railroad. Provided that [Quincy Mining] shall not in any case mine within fifteen feet of the surface of the [rock?] without the consent in writing of [Mineral Range] together with all and singular the hereditaments

3

and appurtenances thereunto belonging or in anywise appearing to have and to hold the said strip of land with the appurtenances, for the purpose and uses above stated and subject to the reservations aforesaid unto [Mineral Range] its successors and assigns forever In Witness Whereof [Quincy Mining] has caused its corporate seal to be affixed and these presents to be executed by its President and Secretary the day and year first above written. Signed, sealed and delivered . . . .

Quincy Mining, the grantor, subsequently transferred its remaining interest in the Houghton County property to the Armstrong-Thielman Lumber Company, which, in turn, sold its interest to defendant Carmody-Lahti Real Estate, Inc. Mineral Range later conveyed its right-of-way to the Soo Line Railroad Company, which, until the early 1980s, continued to utilize the right-of-way for railroad purposes.

Although the railroad industry was central to the economic vitality of our nation in the mid-nineteenth century, its dominance began to wane in the late nineteenth and early twentieth centuries—the years following the initial transfer of the Houghton County right-of-way.[1] But even as railroading itself declined in importance, the United States Congress determined that the rail corridors

---

[1] See, generally, Wright & Hester, *Pipes, wires, and bicycles: Rails-to-Trails, utility licenses, and the shifting scope of railroad easements from the nineteenth to the twenty-first centuries*, 27 Ecology L Q 351 (2000).

themselves might prove vital for future economic growth.[2]

Accordingly, Congress enacted the Transportation Act of 1920, which required, among other things, that railroad companies seek and obtain the permission of the Interstate Commerce Commission (ICC) before abandoning any extant rail line.[3] Congress has since amended this procedure with the Railroad Revitalization and Regulatory Reform Act (RRRRA) of 1976,[4] and again with the Staggers Rail Act of 1980.[5]

---

[2] See *Preseault v Interstate Commerce Comm,* 494 US 1, 5-6; 110 S Ct 914; 108 L Ed 2d 1 (1990). See also Wild, *A history of railroad abandonments,* 23 Transp L J 1 (1995).

[3] Transportation Act, 41 Stat 456 (1920). See Wild, *supra,* p 4 (noting that the Transportation Act was largely concerned with "railroad rate policies"). Abandonment is to be distinguished from mere discontinuance of service. See *Preseault, supra* at 6 n 3. The former involves relinquishing rail lines and underlying property interests. Discontinuance, on the other hand, "allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." *Id.*

[4] Railroad Revitalization and Regulatory Reform Act of 1976, PL 94-210, 90 Stat 31 (1976). See Wild, *supra,* pp 7-8.

[5] Staggers Rail Act of 1980, PL 96-448, 94 Stat 1895 (1980). See also Wild*, supra,* p 9. Congress abolished the ICC in 1995, ICC Termination Act of 1995, 109 Stat 803, and vested authority over railroad abandonment in the Surface Transportation Board, 49 USC 10903. See *RLTD R Corp v Surface Transportation Bd,* 166 F3d 808, 810 (CA 6, 1999). After Soo Line abandoned its Houghton County right-of-way in 1982, Congress amended the National Trails System Act, 16 USC 1241 *et seq.,* to create a "railbanking" program. See 16 USC 1247(d).

In September 1982, Soo Line, which then owned the right-of-way originally granted to the Mineral Range Railroad in 1873, sought federal permission to abandon the railway. The ICC granted this request in a written order on September 29, 1982. The order placed specific conditions on Soo Line's abandonment of its railway:

> Soo Line shall keep intact all of the right-of-way underling [sic] the track, including all the bridges and culverts, for a period of 120 days from the decided date of this certificate and decision to permit any state or local government agency or other interested party to negotiate the acquisition for public use of all or any portion of the right-of-way. In addition, Soo Line shall maintain the Houghton Depot for 120 days from the decided date of this certificate and decision. During this time, Soo Line shall take reasonable steps to prevent significant alteration or deterioration of the structure and afford to any public agency or private organization wishing to acquire the structure for public use the right of first refusal for its acquisition.

Six years after the ICC granted its request to abandon the railway, Soo Line conveyed the right-of-way to plaintiff, the Michigan Department of Natural Resources (MDNR). By that time, the railroad tracks that originally occupied the right-of-way had been largely removed. The record reveals that, by 1988, there were no railroad tracks on the thirty-foot strip of land at issue in this case and there were only remnants of track scattered along the easement. Thus, the task of reconstructing the path of the railroad for litigation purposes was a difficult one. The

6

parties offered on this issue the testimony of several surveyors, and each described a painstaking process in which they consulted a number of maps and searched for remaining physical evidence of the railroad.

The MDNR used the right-of-way as a snowmobile and recreation trail until 1997, when defendant installed a fence that blocked a portion of the right-of-way, substantially interfered with its recreational use, and spawned the present litigation.

In December 1997, plaintiff filed a complaint seeking an order to enjoin defendant from blocking the right-of-way with its fence. Plaintiff argued that it had an unlimited right to use the right-of-way for any purpose because the 1873 deed conveyed to Mineral Range Railroad, its predecessor in interest, a fee simple estate. Defendant argued in response that the deed had conveyed only an easement limited to railroad purposes. The MDNR exceeded the scope of the easement, defendant argued, and had thereby extinguished the right-of-way.

The trial court initially granted summary disposition in plaintiff's favor, concluding that the 1873 instrument conveyed a fee estate rather than an easement and that plaintiff was therefore permitted to use the right-of-way as a snowmobiling trail. The Court of Appeals reversed and remanded the matter to the trial court. Unpublished

opinion per curiam, issued June 5, 2001 (Docket No. 222645). The panel held that the 1873 deed conveyed an easement rather than a fee simple and, accordingly, remanded to the circuit court for a determination whether the easement had been extinguished.

When the matter returned to the trial court, defendant filed a motion for summary disposition, arguing that the right-of-way had been extinguished by abandonment or by a 1920 tax sale of the servient estate. The trial court rejected both claims, granted summary disposition to plaintiff, and ordered the injunctive relief—removal of defendant's fence—sought by plaintiff.

Defendant appealed this judgment to the Court of Appeals. There, defendant no longer asserted that Soo Line had abandoned the easement as a result of the 1920 tax sale. Rather, defendant maintained that plaintiff's predecessor abandoned the easement. The Court of Appeals, like the trial court, rejected this argument. The panel affirmed the judgment of the trial court, holding that Quincy Mining had not conveyed the easement for any "particular purpose" and, therefore, that Soo Line's termination of rail service through the right-of-way was not an abandonment of its easement. Unpublished opinion per curiam, issued June 3, 2003 (Docket No. 240908).

8

Assessing the specific language of the 1873 instrument, the Court of Appeals stated:

> [W]e believe that the phrase in the 1873 deed, "a right of way for the railroad of [the Mineral Range Railroad]," cannot be construed as a defeasance clause or as granting the easement for a particular purpose only. In making this determination, *Quinn* [*v Pere Marquette R Co,* 256 Mich 143; 239 NW 376 (1931)] is instructive. The phrase is akin to a statement of purpose. The declaration that the easement was for the Mineral Range Railroad's construction of a railroad was "merely an expression of the intention of the parties that the deed is for a lawful purpose." *Quinn, supra* at 151. Thus, Soo Line's cessation of rail service and subsequent sale of the easement to be used for non-railroad purposes did not automatically extinguish the easement. [Slip op at 6-7.]

The panel also rejected the argument that Soo Line's abandonment application to the ICC in 1982 constituted an abandonment of the easement.[6] In the end, the panel determined that Soo Line had a legitimate property interest to convey to plaintiff and that plaintiff was therefore entitled to summary disposition.

---

[6] The Court stated:

> In regards to the ICC certificate of abandonment, the ICC only regulates and approves cessation of railroad operations, it "does not determine abandonment." [*Id.* at 9 (citation omitted).]

9

This Court granted defendant's application for leave to appeal on June 3, 2004, and solicited amicus briefs.[7] We initially denied plaintiff's application for leave to cross-appeal from the first Court of Appeals opinion (holding that the 1873 deed conveyed an easement). However, after hearing oral arguments, we requested additional briefing on the question whether the 1873 deed conveyed a fee simple or an easement.[8]

## II. STANDARD OF REVIEW

A trial court's decision to grant or deny summary disposition under MCR 2.116(C)(10) is subject to review de novo.[9] Under this court rule, a party is entitled to summary disposition when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law."[10]

## III. ANALYSIS

Plaintiff, the Michigan Department of Natural Resources, asserts the right to use of a former railroad right-of-way in Houghton County, Michigan, as a public

---

[7] *Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc,* 470 Mich 868 (2004).

[8] *Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc,* 687 NW2d 298 (2004).

[9] *Kreiner v Fischer*, 471 Mich 109, 129; 683 NW2d 611 (2004).

[10] MCR 2.116(C)(10).

snowmobile and outdoor recreation trail. Defendant, Carmody-Lahti Real Estate, Inc., purports to own the land underlying the trail in fee simple and claims the legal right to bar public recreational use of the right-of-way. At first blush, then, this case seems to concern land use policy. Moreover, it is a policy question on which both our federal and state legislatures have spoken: Congress has enacted the National Trails System Act,[11] which codifies a federal policy of preserving our nation's rail corridors; the Michigan Legislature has enacted the State Transportation Preservation Act in 1976, which declares a legislative preference for using dormant railways as recreational trails.[12]

But the question of how the land *ought* to be used is not before us. Instead, this appeal presents us with the more modest task of discerning the meaning of a late-nineteenth century deed. In order to determine whether plaintiff is entitled to the injunctive relief granted on remand by the trial court, we must determine, first, whether the "right of way" conveyed by the 1873 deed in question is an easement or a fee simple. If the right-of-way is an easement, we must then establish whether

---

[11] 16 USC 1241-1249.

[12] MCL 474.51 *et seq.*

11

plaintiff has exceeded the scope of the easement or has abandoned it.

### A. RIGHT-OF-WAY AS FEE SIMPLE OR EASEMENT

Our initial task is to establish the precise contours of the property interest conferred upon Mineral Range Railroad, plaintiff's predecessor in interest. According to plaintiff, the 1873 deed conveyed the land *itself* to Mineral Range Railroad. Thus, plaintiff argues that, as Mineral Range's successor in interest, it owns the land described by the 1873 deed in fee simple. Defendant argues, however, that the deed transferred only an easement—the right to *use* the land—rather than the land itself.

An inquiry into the scope of the interest conferred by a deed such as that at issue here necessarily focuses on the deed's plain language,[13] and is guided by the following principles:

> (1) In construing a deed of conveyance[,] the first and fundamental inquiry must be the intent of the parties as expressed in the language thereof; (2) in arriving at the intent of parties as expressed in the instrument, consideration must be given to the whole [of the deed] and to each and every part of it; (3) no language in the instrument may be needlessly rejected as meaningless, but, if possible, all the language of a deed must be harmonized and construed so as to make all of it meaningful; (4) the only purpose of rules of construction of conveyances

---

[13] *Quinn, supra* at 150.

is to enable the court to reach the probable intent of the parties when it is not otherwise ascertainable.[14]

These four principles stand for a relatively simple proposition: our objective in interpreting a deed is to give effect to the parties' intent as manifested in the language of the instrument.

The instrument's granting clauses are a natural starting point for discerning the parties' intent.[15] The deed purports to convey a "right of way" that "consist[s]" of a "strip of land . . . across [the parcels described in the deed]." As we recognized over seventy years ago in *Quinn,* a deed *granting* a right-of-way typically conveys an easement, whereas a deed granting *land itself* is more appropriately characterized as conveying a fee or some other estate:

> Where the grant is not of the land but is merely of the use or of the right of way, or, in

---

[14] *Purlo Corp v 3925 Woodward Avenue, Inc*, 341 Mich 483, 487-488; 67 NW2d 684 (1954) (citations omitted).

[15] Although it may look at first glance as though the deed grants two separate rights-of-way, the instrument grants only a *single* right-of-way, one that is positioned slightly differently within the first and second sets of plats described in the deed. The entire right-of-way is measured from a single line surveyed across a series of plats. For the first set of plats, the right-of-way is one hundred feet total in width, measured fifty feet on either side of the survey line. For the second set of plats, the right-of-way is still one hundred feet total in width, but it is measured twenty feet on one side of the surveyed line and eighty feet on the other.

some cases, of the land specifically for a right of way, it is held to convey an easement only.

Where the land itself is conveyed, although for railroad purposes only, without specific designation of a right of way, the conveyance is in fee and not of an easement.[16]

Here, the deed's granting clause conveys only a right-of-way. The plain language of the deed, as well as the rule of construction articulated in *Quinn,* therefore indicate that the deed conveyed an easement rather than a fee simple.

Plaintiff relies on *Quinn* for the proposition that the term "right-of-way" "has two meanings in railroad parlance: the strip of land upon which the track is laid, and the legal right to use such strip."[17] The former meaning, in plaintiff's view, is an estate in real property, whereas the latter—the right to *use* property—is an easement only.

---

[16] *Quinn, supra* at 150-151 (citations omitted). A similar distinction was made in *Jones v Van Bochove,* 103 Mich 98, 100; 61 NW 342 (1894):

We think the court below was correct in holding that the deed conveyed an easement only, and not a fee. It does not purport to convey a strip of land 40 feet wide, etc., but the right of way over a strip 40 feet wide. Cases, undoubtedly, can be found in which the operative words of the grant relate to the land itself; but such construction cannot be given to this deed.

[17] *Quinn, supra* at 150. See also anno: *Deed to railroad company as conveying fee or easement,* 6 ALR 3d 973 (1966); 65 Am Jur 2d, Railroads, § 40, p 234.

Because "right-of-way" may be defined in two ways, plaintiff contends that the 1873 deed is ambiguous.

The initial flaw with this argument is this: although "right-of-way" is susceptible to two meanings, it does not follow that the phrase is equally susceptible to either meaning in this case. As already noted, application of the principles articulated in *Quinn* shows that this deed—which grants a "right of way" rather than, for example, a strip of land to be used as a right-of-way—conveys an easement only.

Moreover, it would make little sense to read the phrase "right of way" as referring to a strip of land. Recall that the deed conveys a right-of-way, and subsequently describes that right-of-way as "consist[ing] of a strip of land . . . ." If "right of way" is to be interpreted as conveying the land itself rather than passage *over* a strip of land, then the instrument must be interpreted as transferring "*[a strip of land] . . . to consist of a strip of land . . . .*" This reading produces a redundancy and violates the principle that "all the language of a deed must be harmonized and construed so as to make all of it meaningful . . . ."[18] Accordingly, it is an interpretation we must reject.

---

[18] *Purlo, supra* at 487-488.

15

According to the granting clause, the right-of-way to which the deed refers appears to be "the legal right to use the . . . strip"—or, in other words, an easement.[19] The deed contains no language that belies this conclusion or affirmatively indicates that the parties intended to convey a fee simple. Although the deed refers to "strips of land," even a cursory reading of the deed reveals that these references are merely descriptive of the right-of-way,[20] the object of the granting clauses, and are not an attempt to convey an interest in the land itself.

Indeed, one need only examine the language describing the right-of-way as consisting of a "strip of land . . . *across*" the described parcels to confirm this fact. That the parties described the interest as going "across" the land reveals that they understood the right-of-way as being distinct from the land itself. As in *Westman v Kiell,*[21]"[t]his language evidences an intent to convey a use

---

[19] See *Quinn, supra* at 150 (noting that "[w]here the grant is not of the land but is merely of the use or of the right of way . . . it is held to convey an easement only").

[20] Compare *Jones v Van Bochove*, 103 Mich 98; 61 NW 342 (1894) (described earlier in this opinion).

[21] 183 Mich App 489; 455 NW2d 45 (1990).

16

or right of way upon and across the land, or, in other words, an easement."[22]

The language of the habendum clause is also consistent with conveyance of an easement. This clause states that Mineral Range Railroad was "to have and to hold the said strip of land with the appurtenances, for the purpose and uses above stated and subject to the reservations aforesaid . . . forever . . . ." The reference in the habendum clause to the "purpose and uses above stated and . . . the reservations aforesaid" demonstrates the parties' intent to convey only the limited property interest previously described in the deed. Although the habendum clause refers to a "strip of land," the context of this phrase—particularly the references to "strip[s] of land" in clauses that precede the habendum clause—shows that this reference describes the geographical placement of the easement rather than the nature of the property interest conveyed.

Plaintiff contends that Quincy Mining's reservation of mineral rights indicates that the parties intended the deed to convey a fee simple rather than an easement. This argument is unpersuasive. Indeed, plaintiff's assertion that this reservation would have been unnecessary if Quincy

[22] *Id.* at 494.

17

Mining had conveyed only an easement overlooks the key difference between railroad easements and ordinary easements.

Typically, the owner of a servient estate may continue to use land encumbered by an easement.[23] Railroad easements, however, are "essentially different from any other [easement]."[24] As one commentator recently noted, "a railroad right-of-way easement granted by a landowner cannot be used by the landowner for any reason, even if the use does not interfere with the use by the easement holder."[25] For this reason, grantors of railroad rights-of-way have included language in deeds to delineate their continuing use rights in the portion of their fee estate burdened by a railroad easement. In *Michigan Limestone & Chemical Co v Detroit & M R Co,* for example, a railway enjoyed a "right of way *through* plaintiff's property"[26]—an

---

[23] *Harvey v Crane,* 85 Mich 316, 323; 48 NW 582 (1891).

[24] 65 Am Jur 2d, Railroads, § 71, p 254. See also Sennewald, *The nexus of federal and state law in railroad abandonments,* 51 Vand L R 1399, 1412 (1998).

[25] Sennewald, *supra,* p 1411.

[26] 238 Mich 221, 223; 213 NW 221 (1927) (emphasis added).

easement according to the standards articulated in *Quinn*.[27]
Yet the deed expressly reserved for the grantor the right
to build a road, pipeline, or conduit across the railroad
right-of-way to ensure that the grantor's quarry had
continued access to Lake Huron.[28]  Therefore, there is
nothing incongruous about the grantor's reservation of
mineral rights and our conclusion that the right-of-way
conveyed in 1873 was an easement.  Rather, such a
reservation might be expected in a deed conveying a
railroad right-of-way, particularly when the grantor is a
mining company and has a strong interest in protecting its
mining interests.

Although our sole concern is the intent of the parties
as manifested in the plain language of the deed at issue
here, it is worth noting that this analysis of the deed is
consistent with our prior jurisprudence in this area.  In
general, this Court has construed deeds that purport to
convey a right-of-way as transferring an easement.  In
fact, we have been unable to discover a *single* case in

---

[27] *Quinn, supra* at 150 ("Where the grant is not of the land but is merely of the use or of the right of way . . . it is held to convey an easement only.").

[28] *Limestone & Chemical Co, supra* at 223.  See also *Mahar v Grand Rapids Terminal R Co,* 174 Mich 138, 143; 140 NW 535 (1913), noting that a deed conveying an easement "reserve[d] to the [grantors] the right of sewage and drainage across the premises."

which this Court construed a deed conveying a "right of way" as transferring a fee estate, and plaintiff has directed us to none.

In *Jones v Van Bochove*,[29] for example, we considered a deed with a granting clause that conveyed

> "[a]ll that certain piece or parcel of land situate * * * and described as follows, to wit: The right of way for a railroad, running from the marl bed of said cement company to their works, on the west side of the Kalamazoo river, and described as follows: 'A strip of land 40 feet wide * * * and 952 feet in length.'"[30]

We held that this granting clause conveyed an easement rather than a fee, noting that the deed "does not purport to convey a strip of land 40 feet wide, etc., but *the right of way over a strip 40 feet wide.*"[31]  Likewise, in *Mahar, supra,* we determined that the following language conveyed an easement rather than a fee estate:

> "That the said parties of the first part, for and in consideration of the future construction, continued maintenance and operation of a first-class, standard-gauge steam railroad (over which shall be transported passengers and freight) within the time, limits and conditions hereinafter to be defined, . . .

---

[29] 103 Mich 98; 61 NW 342 (1894).

[30] *Id.* at 100.  See also *Westman v Kiell,* 183 Mich App 489, 494; 455 NW2d 45 (1990), holding that a deed conveying a "'right of way *upon* and *across* lands of Henry Salee . . . for the uses and purposes of said Railroad Company'" transferred an easement rather than a fee. (Emphasis in original.)

[31] *Jones, supra* at 100 (emphasis added).

have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell, convey and quitclaim unto the party of the second part, his successors or assigns, *for a right of way for a railroad forever . . . ."*[32]

In contrast, deeds that this Court and the Court of Appeals have read as conveying a fee rather than an easement typically contain language that unambiguously conveys an estate in land and are therefore readily distinguishable from that at issue here. In *Quinn,* this Court held that a deed conveying a "'parcel of land'" "'to be used for railroad purposes only'" conveyed a fee estate.[33] Not only did that deed omit any reference to a "right of way," but it specifically conveyed "*all the estate, right, title, claim and demand whatsoever of the [grantor], both legal and equitable, in and to the said premises . . . ."*[34] This language unambiguously showed the grantors' intent to convey their *entire* estate.

Similarly, the Court of Appeals held that the deed in *O'Dess v Grand Trunk W R Co*[35] concerned a fee. In that case, the deed at issue conveyed "*all the estate, right, title, claim, and demand of the party of the first part,*

---

[32] *Mahar, supra* at 139-140 (emphasis added).

[33] *Quinn, supra* at 146.

[34] *Id.* (emphasis added).

[35] 218 Mich App 694; 555 NW2d 261 (1996).

21

*both legal and equitable."*  Again, this language unequivocally manifested an intent to convey *all* the grantor's rights to the property.

This Court also held that the instrument at issue in *Epworth Assembly v Ludington & Northern Railway*[36] conveyed a fee determinable.  That conveyance purported to be a "quitclaim" deed:

> "Provided, however, if, for any reasons, the property  . . . above described shall, for one year or longer, cease to be used for railroad purposes and trains shall not be run over the railroad track built or to be built on the land described, then and in that case all of the land herein described, together with all and singular the hereditaments and appurtenances belonging or in anywise appertaining thereto shall revert to the Epworth Assembly, of Ludington, Michigan, its heirs and assigns, and *this quitclaim deed* become null and void and of no effect and all rights, title and interest in and to the lands above described remain the same as would have been the case if this *quitclaim deed* had never been executed."[37]

A quitclaim deed is, by definition, "[a] deed that conveys a grantor's *complete interest or claim in certain real property* but that neither warrants nor professes that the title is valid."[38]  Again, then, the deed at issue in *Epworth* showed the grantor's intent to convey *all* its

---

[36] **236 Mich 565; 211 NW 99 (1926).**

[37] *Id.* **at 573 (emphasis added).**

[38] **Black's Law Dictionary (7th ed) (emphasis added). See also *Putnam v Russell,* 86 Mich 389; 49 NW 147 (1891).**

interest in the property and lacked any language indicating that the grantor intended to convey merely an easement.

In short, we have consistently held that deeds conveying a right-of-way transferred an easement. And we have reached a contrary conclusion only in cases in which the deed unmistakably expressed the grantor's intent to convey a fee simple. As shown above, the deed at issue here falls squarely within the first group.

## B. THE NATURE OF THE GRANTEE'S RIGHT-OF-WAY

Although we have determined that the 1873 deed conveyed an easement rather than a fee estate, our inquiry into the scope of the interest conveyed to Mineral Range Railroad, plaintiff's predecessor in interest, is not yet complete. An easement is, by nature, a limited property interest. It is a right to "*use* the land burdened by the easement" rather than a right to "occupy and possess [the land] as does an estate owner."[39] Accordingly, an easement,

[39] Bruce & Ely, The Law of Easements and Licenses in Land, § 1:1 (2004). See also *Rusk v Grande,* 332 Mich 665, 669; 52 NW2d 548 (1952), quoting *Morrill v Mackman,* 24 Mich 279, 284 (1872), and *McClintic-Marshall Co v Ford Motor Co,* 254 Mich 305, 317; 236 NW 792 (1931) ("'An easement is a right which one proprietor has to some profit, benefit or lawful use, out of, or over, the estate of another proprietor. * * * It does not displace the general possession by the owner of the land, but the person entitled to the easement has a qualified possession only, so far as may be needful for its enjoyment.'").

23

whether appurtenant[40] or in gross,[41] is generally confined to a specific purpose.[42]

---

[40] An easement appurtenant is one "created to benefit another tract of land, the use of easement being incident to the ownership of that other tract." Black's Law Dictionary (7th ed).

[41] An easement in gross is one "benefiting a particular person and not a particular piece of land." Black's Law Dictionary (7th ed).

[42] See *St Cecelia Society v Universal Car & Service Co,* 213 Mich 569, 576-577; 182 NW 161 (1921), quoting 9 RCL, Easements, § 2 ("'An easement has been defined as a liberty, privilege or advantage in land without profit, existing distinct from the ownership of the soil. It is a right which one person has to use the land of another for a specific purpose.'"); 28A CJS, Easements, § 2, pp 166-167 ("Generally, an easement is a right that one has to use another's land for a specific purpose that is not inconsistent with the other's ownership interest . . . ."); 25 Am Jur 2d, Easements and Licenses, § 71, p 568 ("The rights of any person having an easement in the land of another are measured and defined by the purpose and character of the easement.").

The dissent asserts that "[w]e infer also that the parties intended that the permitted use of an easement will change over time absent language to the contrary in the deed." *Post* at 7. For this proposition, it cites Restatement Property, 3d, § 4.10, p 592. This passage provides:

> Except as limited by the terms of the servitude determined under § 4.1, the holder of an easement or profit as defined in § 1.2 is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude. The manner, frequency, and intensity of the use may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate or enterprise benefited by the servitude. Unless authorized by the terms of the servitude, the holder is not entitled to

24

In order to determine whether the easement at issue here is limited to a specific purpose, we must discern the parties' intent as shown by the plain language of the deed.[43] Here, the parties conveyed a right-of-way "for the railroad" of the original grantee. This language shows quite clearly that the parties intended to convey an easement *for a railroad*. Even the paragraph reserving the grantor's rights to extract minerals from the strip of land at issue states that such extraction must be performed "in such manner as not to interfere *with the construction or operation of said railroad*." Finally, the deed's habendum clause expressly states that the right-of-way is the grantee's "to have and to hold . . . *for the purpose and uses above stated and subject to the reservations aforesaid* . . . ." The only purpose and use mentioned in the instrument is the construction and operation of a railroad.

cause unreasonable damage to the servient estate
or interfere unreasonably with its enjoyment.

This passage suggests that the "manner, frequency, and intensity" of the grantee's use of the easement may change through time; this is an assertion with which we have no quarrel. But, where a deed grants an easement limited to railroad purposes, it is only the "manner, frequency, and intensity" of *railroad uses* that may change over time. The Restatement does not suggest that the fundamental nature of an easement may change through time. Moreover, while the dissent acknowledges that specific language in the deed may curb the extent to which an easement adapts to changing circumstances, *post* at 7, it fails to recognize the limits imposed by the specific language in the deed at issue here.

[43] *Purlo, supra* at 487-488.

25

We conclude, therefore, that the easement conveyed by the 1873 deed is limited to railroad purposes.[44]

Plaintiff maintains that the interest conveyed by the 1873 deed is not limited to railroad purposes, referring us to *Quinn, supra,* as support for its argument. In *Quinn,* we held that the landowners had conveyed a fee simple (rather than an easement) to the defendant railway company and, thus, that the defendant was entitled to drill for oil and gas in the subject property. Justice Fead, writing for the Court, reasoned, "Where the land itself is conveyed, although for railroad purposes only, without specific designation of a right of way, the conveyance is in fee and not of an easement."[45] He then rejected the proposition that the fee was limited to a specific use: "Had the grant contained a reverter clause the title would have been a determinable fee upon condition subsequent."[46] Plaintiff argues, therefore, that the *lack* of a defeasance clause in

---

[44] The dissenting opinion concludes that "the deed created a right-of-way for a transportation corridor where the grantee could run a railroad." *Post* at 8. We can find no mention of a "transportation corridor" in the deed, and cannot locate any "broad language," *id.*, that would support such a reading (nor does the dissent cite any such language). We simply see no principled way to justify the dissent's reading in light of the applicable rules of construction.

[45] *Quinn, supra* at 150-151.

[46] *Id.* at 152.

the 1873 deed indicates, as shown by *Quinn,* that the interest conveyed was not intended to be limited to railroad purposes.

Plaintiff's reliance on *Quinn* is misplaced, for that case is distinguishable in an important sense from the case at bar. At issue in *Quinn* was a fee simple—an *estate* in land. Here, we are concerned with the scope of an easement—an *interest* in land.[47] Fee simple estates revert to the grantor only if they contain language providing for reversion. Easements, on the other hand, are *inherently* limited estates in land.[48] Thus, the principles applicable to the fee simple in *Quinn* do not translate to the easement under consideration in this case.

We conclude, therefore, that the plain language of the 1873 deed limited the easement conveyed to the original grantee to railroad purposes.

## C. ABANDONMENT OF THE EASEMENT

Finally, we turn to the question whether plaintiff has a valid interest in this easement limited to railroad

---

[47] See *Kitchen v Kitchen,* 465 Mich 654, 659; 641 NW2d 245 (2002). The dissenting opinion makes similar errors, first relying on *Quinn* to (mis)interpret the language of the deed at issue here, *post* at 4-5, and then citing the absence of "defeasance or reverter language" to argue that the easement was not limited to railroad purposes. *Id.* at 8.

[48] See note 33.

purposes. This easement, limited as it is to a particular purpose, will "terminate[] as soon as such purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment."[49] In this case, defendant alleges that the easement was terminated because of the actions of plaintiff's predecessor in interest. Thus, we must determine whether plaintiff's predecessor in interest abandoned its interest in the Houghton County right-of-way.

Before determining whether plaintiff's predecessor in interest abandoned the easement, however, a brief overview of federal and state rails-to-trails legislation is necessary. The Sixth Circuit Court of Appeals succinctly summarized the applicable federal legislation in *RLTD R Corp v Surface Transportation Bd*:[50]

> In the Transportation Act of 1920, Congress gave the Interstate Commerce Commission ("ICC") jurisdiction over railroad track abandonments. Pursuant to the ICC Termination Act of 1995, the ICC ceased to exist. Authority over abandonment applications is now held by the [Surface Transportation Board (STB)].
>
> Prior to the enactment of the Transportation Act, state and local authorities constrained railroad companies in their efforts to abandon unprofitable tracks. In giving the ICC/STB authority to grant or deny applications for abandonment, Congress sought to balance the railroad companies' need to dispose of trackage that was no longer profitable with the public's

---

[49] 25 Am Jur 2d, Easements and Licenses, § 96, p 594.

[50] 166 F3d 808 (CA 6, 1999).

28

need for a working interstate track system. If a railroad track falls within its jurisdiction, the ICC/STB has exclusive authority to determine whether abandonment will be permitted. The ICC/STB may approve an abandonment after a full administrative proceeding, or it may authorize abandonment by granting an exemption from the section 10903 process for "out-of-service" rail lines. The ICC/STB loses its jurisdiction over a rail line once the line is abandoned pursuant to an ICC/STB authorization. Actual abandonment pursuant to authorization is known as "consummation."[51]

The 1976 Michigan State Transportation Preservation Act (MSTPA) works in concert with the federal legislation. It declares that the "preservation of abandoned railroad

---

[51] *Id.* at 810-811 (citations omitted). In 1983, Congress amended the National Trails System Act to create a "railbanking" program. See 16 USC 1247(d); *Wright and Hester, supra* at 356-357 ("The rails-to-trails program was born after President Johnson signed the National Trails System Act in 1968 and Congress, responding to the alarming increase in railroad abandonments and the growing need for alternative transportation corridors, implemented what has come to be called its "railbanking" policy through its amendment of the Trails Act in 1983."). Federal law, as the Sixth Circuit Court of Appeals noted, now

allows a railroad wishing to cease operations along a stretch of track to negotiate with the state, municipality, or private group concerning the transfer of financial and managerial responsibility for the railroad corridor and the maintenance of the corridor for possible future rail use—called "railbanking". Railbanking is an alternative to abandonment. With railbanking, the railroad maintains ownership of the rail corridor, a third party makes interim use of the rail corridor, and the ICC/STB's jurisdiction over the rail corridor continues. When a track is abandoned, however, ICC/STB jurisdiction ceases, and, in the usual case, reversionary interests in the rail corridor become effective. [*RLTD R Corp, supra* at 810-811.]

29

rights of way for future rail use and their interim use as public trails" is a "public purpose."[52] The act therefore requires railroad companies wishing to abandon a railway to notify the state Department of Transportation and authorizes the Department of Transportation or the MDNR to acquire abandoned railways.[53] If a right-of-way is acquired under the MSTPA, the acquiring department "may preserve the right-of-way for future use as a railroad line and, if preserving it for that use, shall not permit any action which would render it unsuitable for future rail use."[54]

With this background in the applicable federal and state law, we turn now to the question whether Soo Line, plaintiff's predecessor in interest, abandoned the right-of-way at issue here.

On September 29, 1982, the ICC authorized Soo Line's abandonment, for purposes of federal law, of the railway at issue in this case. The ICC "certificate and decision" reports that the Michigan Department of Transportation originally provided financial assistance to Soo Line on terms established by the ICC. After the financial assistance agreement expired on October 1, 1982, the ICC

---

[52] MCL 474.51(3).

[53] MCL 474.56, 474.58.

[54] MCL 474.60(11).

30

granted Soo Line permission to abandon the railway.  The ICC's decision included the following terms:

> Soo Line shall keep intact all of the right-of-way underling [sic] the track, including all the bridges and culverts, for a period of 120 days from the decided date of this certificate and decision to permit any state or local government agency or other interested party to negotiate the acquisition for public use of all or any portion of the right-of-way.  In addition, Soo Line shall maintain the Houghton Depot for 120 days from the decided date of this certificate and decision.  During this time, Soo Line shall take reasonable steps to prevent significant alteration or deterioration of the structure and afford to any public agency or private organization wishing to acquire the structure for public use the right of first refusal for its acquisition.

Soo Line followed the procedures necessary to abandon the railroad and, after the 120-day period ordered by the ICC, was free to abandon its right-of-way.  That is not to say, however, that the easement, a creature of state law distinct from the rail that physically occupied the right-of-way, was necessarily abandoned at the end of the 120-day period prescribed by the ICC.

An easement holder abandons a railroad right-of-way when "non-user is accompanied by acts on the part of the owner of either the dominant or servient tenement which manifest an intention to abandon, and which destroy the object for which the easement was created or the means of

31

its enjoyment . . . ."[55]   This principle was recently summarized by the Court of Appeals in *Ludington & Northern Railway v Epworth Assembly*:

> To prove abandonment, both an intent to relinquish the property and external acts putting that intention into effect must be shown. Nonuse, by itself, is insufficient to show abandonment. Rather, nonuse must be accompanied by some act showing a clear intent to abandon.[56]

In this case, it is clear that the railway is no longer used. The question, therefore, is whether Soo Line manifested an intent to abandon the underlying *easement* and not simply the railway that utilized the easement.

This intent cannot *necessarily* be inferred from the fact that a railroad company sought and obtained permission from the ICC/STB to abandon a railway and took action consistent with that federal authorization.[57]   A railway

---

[55] *Van Bochove, supra* at 101.

[56] 188 Mich App 25, 33; 468 NW2d 884 (1991) (citations omitted).

[57] On this point, we agree with the dissent. We part company, of course, in assessing the legal significance of Soo Line's petition to abandon its railroad under Michigan real property law.

The majority and dissent also differ on a related point. The dissenting opinion presumes that we may rely on the views of Congress and federal agencies on questions of state real property law such as abandonment. See *post* at 9 ("Congress has made clear that use of a rail line as a recreational trail after the issuance of a certificate of abandonment should not be equated with abandonment of the easement."). Assuming the dissent's assertions about the

32

located on an easement is analytically distinct, after all, from the easement itself. But as already shown, the easement in this case is *itself* limited to railroad purposes under the 1873 deed. Therefore, in both seeking federal permission to abandon its railroad and removing the rails themselves, Soo Line manifested an intent to abandon the underlying easement (which was limited to railroad uses) and took action consistent with that intent.[58]

The United States District Court for the Western District of Michigan reached a similar conclusion in *Belka*

---

views of Congress are correct, we believe that Justice Kelly's reliance on those views is misplaced. Unless federal law expressly or implicitly preempts state law in this area, we see no reason to defer to Congress in determining when an easement is abandoned for purposes of Michigan's common law of real property. See *Crosby v Nat'l Foreign Trade Council,* 530 US 363, 372-373; 120 S Ct 2288; 147 L Ed 2d 352 (2000) (describing federal preemption principles).

[58] Plaintiff's argument to the contrary relies largely on the Court of Appeals opinion in *Strong v Detroit & M R Co,* 167 Mich App 562; 423 NW2d 266 (1988). Read carefully, *Strong* does little to advance plaintiff's cause. In that case, there was no indication that the easement was limited to railroad purposes as was the right-of-way at issue here. It is not surprising that the Court of Appeals would not hold that mere removal of a railroad track constituted abandonment of an underlying property interest when the interest was not limited to railroad purposes. Moreover, the easement holder in *Strong* filed notice of its easement under the marketable record title act, MCL 565.103. This filing "indicated that [the easement holder] intended to preserve its interest." *Strong, supra* at 569.

33

*v Penn Central Corp.*[59]  In *Belka,* the plaintiffs argued that the easement possessed by Penn Central was limited to railroad purposes[60] and, therefore, that Penn Central

---

[59]  1993 US Dist LEXIS 15836 (WD Mich, 1993) (unpublished), aff'd without opinion 74 F3d 1240 (CA 6, 1996).

[60] The conveyance at issue in *Belka* provided:

This indenture, Made this     day of A.D. 18  , BETWEEN     of     in the County of  , and State of Michigan, of the first part, and the Kalamazoo, Allegan and Grand Rapids Rail Road Company, of the second part, Witnesseth, That the said parties of the first part, in consideration of the sum of    , to them in hand paid, the receipt whereof is hereby acknowledged, do grant, bargain, sell and confirm unto the said party of the second part, and to their assigns FOREVER, a RIGHT OF WAY in and over a certain strip of LAND, situate, lying and being in [legal description] reference being made, for more certain description of said strip, to the map of the route of said Company, on file in the offices of the Register of Deeds for the Counties of Kalamazoo and Allegan and Kent respectively, for the said party of the second part, and their assigns and their servants and agents to build, construct and maintain a Rail Road in and over the said strip of land, and at all times freely to pass and re-pass by themselves, their servants, agents and employees, with their engines, carts, horses, cattle, carts, wagons and other vehicles, and to transport freight and passengers, and to do all other things properly connected with or incident to the location, building, maintaining, and running the said Road, and to use the earth and other materials within said strip of land, for that purpose, TO HAVE AND TO HOLD the said easements and privileges to the said party of the second part, and to their assigns, FOREVER. And the said parties of the first part for themselves and their heirs, doth covenant and agree that they will WARRANT AND

abandoned the underlying easement when it manifested its intent to abandon all railroad operations. The court held that, in abandoning its easement with STB permission, removing its tracks, and attempting to sell its easement, Penn Central had abandoned its railway under state property law. Penn Central's contention that it intended to keep the underlying easement, even as it abandoned the railway, was rejected:

> This argument has superficial appeal, but it breaks down under scrutiny. The flaw in this argument is that while Defendants claim no intent to abandon their "property interest" they do not specify what that property interest is. Whether Defendants intended to abandon their property rights cannot be determined without consideration of the nature of that property interest. Defendants did not own a fee simple interest in the railroad corridor. They had an easement to use it "for railroad purposes." Accordingly, the issue for this Court is not whether Defendants intended to abandon some nebulous concept of "property rights", but whether they intended to abandon their right to use the property "for railroad purposes".[61]

We find the district court's analysis in *Belka* persuasive. The easement originally granted to Mineral Range Railroad, subsequently transferred to Soo Line Railroad, and finally conveyed to plaintiff was limited to railroad purposes. Therefore, Soo Line's decision to seek

---

DEFEND the above granted RIGHT OF WAY in the peaceable and quiet possession of the said party of the second part, and their assigns, FOREVER. [*Id*. at *2 n 2.]

[61] *Id*. at *14-*15.

federal permission to cease all rail operations on the right-of-way, its subsequent cessation of those activities after the 120-day period prescribed by the ICC, and its removal of all railroad tracks on the strip of land constituted an abandonment of the underlying property interest.

We have determined, therefore, that the 1873 deed conveyed an easement limited to railroad uses and that Soo Line abandoned that easement for state property law purposes when it sought, obtained, and acted on the ICC's permission to abandon the railway in 1982. Consequently, Soo Line did not have a valid property interest in the Houghton County right-of-way to convey to plaintiff in 1988. Defendant has an unencumbered fee simple interest in the right-of-way and, as any property owner in Michigan may do with its property, may limit its use as it sees fit.

### D. RESPONSE TO THE DISSENT

The dissenting opinion insists that we should not have entertained defendant's appeal at all because the ICC/STB has exclusive jurisdiction over what is left of Soo Line's railroad in this area.[62] The dissent's argument, in essence, is this:

> The record in this case contains nothing
> that shows that the Soo Line ever advised the ICC

---

[62] *Post* at 8.

that it had completed abandonment as the certificate required. It appears that no notice of consummation was filed with the ICC or the STB. Consequently, in 1983, a year after the certificate was issued, the abandonment authorization would have expired. The rail line cannot be abandoned without a new proceeding.[63]

As an initial matter, we note that the dissent does not argue that Soo Line *actually* failed to notify the ICC, but argues instead that the record contains no evidence that Soo Line provided notice. Of course, it would be just as accurate to say that the record contains no evidence that Soo Line *failed* to provide notice because, in fact, neither party has raised the notice issue on which the dissent now relies. It is hardly surprising, therefore, that there is a gap in the evidentiary record on this question.[64] We would be unwise indeed to draw sweeping inferences from this sort of evidentiary "gap."

Even if there were a factual basis for the dissent's argument, its legal rationale is deeply flawed. First and foremost, the dissenting opinion relies on a provision of the Code of Federal Regulations that was enacted almost

---

[63] *Post* at 7-8.

[64] That is not to say that the parties may waive or concede the question of subject-matter jurisdiction. To the contrary, subject-matter jurisdiction cannot be waived. *Travelers Ins Co v Detroit Edison Co,* 465 Mich 185, 204; 631 NW2d 733 (2001).

*fifteen years* after Soo Line's application to abandon its railroad and is, therefore, inapplicable here.[65]

The dissent also relies on the fact that the ICC had a "practice"[66] of requesting notice of abandonment in the early 1980s[67] and that the ICC operated on the belief that it lacked jurisdiction once a notice of abandonment had been filed.  We believe that the dissent misconstrues the legal significance of this "practice."

While the ICC has determined that its jurisdiction terminated once notice of abandonment was filed, neither the ICC nor the STB has ever concluded, as the dissent does, that state courts *lack* jurisdiction as a matter of law until notice of abandonment is filed or until the

---

[65] See *post* at 8, citing 49 CFR 1152.29(e)(2).  49 CFR 1152.29, which provides that notice to the STB is necessary in order to consummate a railway abandonment, did not exist until 1997.  See, e.g., *Becker v Surface Transportation Bd,* 328 US App DC 5, 6 n 2; 132 F3d 60 (1997).

[66] See *Consolidated Rail Corp v Surface Transportation Bd*, 320 US App DC 130, 135; 93 F3d 793 (1996), citing *St Louis Southwestern R Co—Abandonment—in Smith & Cherokee Cos, Tx,* 9 ICC 2d 406, 410 n 8 (1992) (noting that the "practice" of requiring notice ended in 1984).

[67] *Post* at 7 n 6, citing 363 ICC 132, 142 n 2 (1980). The authority cited is an ICC opinion that states: "When a rail line has been fully abandoned, it is no longer rail line and the transfer of the line is not subject to our jurisdiction."  *Id.* at 135.  The opinion provides in footnote 2 that "[a] line is fully abandoned after a certificate of public convenience and necessity has been issued, and when operations have ceased, tariffs have been canceled and a letter has been filed with the Commission that the abandonment has been consummated."

38

ICC/STB has declared that its jurisdiction has ended.[68] Indeed, even now that notice is actually required by STB regulations, notice of abandonment is not *necessary* to terminate the STB's jurisdiction.[69] It is simply conclusive evidence that the railroad has consummated its abandonment.[70] Abandonment may occur—and, thus, the STB's jurisdiction may terminate—even in the absence of written notice.[71]

---

[68] Although the STB "retains exclusive, plenary jurisdiction to determine whether there has been an abandonment sufficient to terminate its jurisdiction," *Lucas* v *Bethel Twp,* 319 F3d 595, 603 (CA 3, 2003), plaintiff has not requested such a determination from the STB and the STB itself has not intervened in this case.

[69] See 49 CFR 1152.29(e)(2) ("Notices will be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation . . . .").

[70] See, e.g., *Consolidated Rail Corp, supra,* at 798 ("In its October 5, 1995 Decision, the ICC also suggested that Conrail's failure to notify the Commission that the line had been abandoned was *evidence of Conrail's uncertainty of purpose [regarding abandonment].*") (emphasis added); 61 FR 11174, 11177-11178, which included the following explanation of the proposed rule that became 49 CFR 1152.29:

> [U]nder our proposal, notices that are filed would be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation . . . . If no notice of consummation of abandonment has been filed, we would continue to look at the other facts and circumstances to determine if consummation of the abandonment had occurred.

[71] See 49 CFR 1152.29(e)(2) (providing that notice is "deemed conclusive" on the point of consummation in the

In short, the dissent has offered neither a factual nor legal basis to support its assertion that the STB has exclusive jurisdiction over the present dispute. We conclude, therefore, that the dissenting opinion's jurisdictional argument is in error.

### IV. CONCLUSION

We conclude that the Court of Appeals erred in holding that plaintiff is entitled to summary disposition. The limited easement owned by plaintiff's predecessor in interest had been abandoned by the time the predecessor purported to sell that property interest to plaintiff. We therefore reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of summary disposition in defendant's favor.

Robert P. Young, Jr.
Clifford W. Taylor
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Stephen J. Markman

---

absence of "legal or regulatory barriers to consummation." See also *Lucas v Bethel Twp*, 319 F3d 595, 603 n 11 (CA 3, 2003) ("Historically, the STB determined whether an abandonment was consummated by evaluating the carrier's objective intent to cease permanently or indefinitely all transportation service on the line. This test leaves a great deal of uncertainty as to the rail line's status, however. Since 1997, the STB has taken steps to alleviate this problem by renewing a requirement that railroads file with the agency a letter confirming consummation of abandonment.") (citation omitted).

MICHIGAN DEPARTMENT OF
NATURAL RESOURCES,

    Plaintiff-Appellee,
    Cross-Appellant

v                                No. 124413

CARMODY-LAHTI REAL ESTATE, INC.,
a Michigan corporation,

    Defendant-Appellant,
    Cross-Appellee.

_____

KELLY, J. (*dissenting*).

    I agree with the majority's conclusion that plaintiff's property interest is an easement rather than a fee simple. However, I conclude that this Court should not find that the easement was abandoned.

    Defendant has not shown that plaintiff's predecessor, the Soo Line Railroad Company, completed the federal regulatory process for abandonment. Therefore, it appears that the rail line remains under the jurisdiction of the Surface Transportation Board[1] for future reinstatement of

_____

    [1] The Surface Transportation Board (STB) assumed the functions of the Interstate Commerce Commission (ICC) effective January 1, 1996. 49 USC 10101-16106; 49 USC 10903; 49 USC 10501(a)(1). *Railroad Ventures, Inc v Surface Transportation Bd*, 299 F3d 523, 530 (CA 6, 2002). For simplification, I refer to them both as the ICC because

service.  If that is the case, defendant may not circumvent federal jurisdiction by obtaining a state court judgment of abandonment.

Even if abandonment of the line were consummated with the ICC, we should conclude that the Soo Line never abandoned the underlying easement before conveying it to plaintiff for a trail.  The mere fact of the sale demonstrates that the Soo Line intended to retain dominion over the easement until disposing of it.  If the company believed in 1982 that it was abandoning this property interest, it would not have sold a portion of it to plaintiff in 1985.

Moreover, the parties who originally created the easement did not intend to limit its use to a rail line. Rather, they created a right-of-way to last forever, one that can be used today as a recreational trail.

Therefore, the result reached by the trial court and the Court of Appeals should be affirmed.

FACTUAL BACKGROUND

In 1873, the Quincy Mining Company granted an easement for a right-of-way to the Mineral Range Railroad Company.

---

that was the agency that governed the Soo Line at the time in question.

2

Defendant now owns a portion of the mining company's former property through which this right-of-way runs.

The Mineral Range Railroad built and for many years operated a rail line on the right-of-way. It then transferred the rail line and right-of-way to the Soo Line Railroad. In the 1980s, the Soo Line discontinued running trains on the rail line. Sometime after 1986, it removed some of the tracks and, in 1988, sold the right-of-way to plaintiff Michigan Department of Natural Resources. Plaintiff maintained the former railway grade as a recreational trail. But, nine years later, defendant installed a fence across the trail, blocking its use as a trail.

PROCEEDINGS BELOW

Plaintiff filed suit seeking an injunction to force removal of the fence. The trial court initially held that Mineral Range had an unrestricted fee simple interest that it passed to plaintiff by deed. The Court of Appeals reversed that holding and remanded the case. Unpublished opinion per curiam, issued June 5, 2001 (Docket No. 222645). It held that the deed conveyed an easement, not a fee simple interest, and remanded the case to the circuit court for a determination whether the easement remained in existence.

3

On remand, the circuit court granted plaintiff's motion for summary disposition. It held that the easement was not limited to use as a rail line. Moreover, it found that the Soo Line had not abandoned the easement. Thus, plaintiff was entitled to maintain the right-of-way as a recreational trail. The Court of Appeals affirmed that decision. Unpublished opinion per curiam, issued June 3, 2003 (Docket No. 240908). We granted defendant's application for leave to appeal. 470 Mich 868 (2004).

STANDARD OF REVIEW

The existence of an easement is a question of law. *Mahar v Grand Rapids T R Co,* 174 Mich 138, 142; 140 NW 535 (1913); *Epworth Assembly v Ludington & N R,* 236 Mich 565; 211 NW 99 (1926). In contrast, the permissible use of an easement is a question of fact. *Hanselman v Grand Trunk W R Co,* 163 Mich 496, 499; 128 NW 732 (1910); 65 Am Jur 2d, Railroads, § 60, pp 247-248.

Trial courts may draw inferences of fact. MCR 7.316(A)(6). They are presumed correct[2] and may not be set aside unless found to be clearly erroneous. MCR 2.613(C). We review actions to establish title de novo. *Farmer v Fruehauf Trailer Co,* 345 Mich 592, 595; 76 NW2d 859 (1956).

---

[2] *Beason v Beason,* 435 Mich 791, 804; 460 NW2d 207 (1990).

4

Under federal transportation law involving rail lines, abandonment has a specific meaning. *Bingham Twp v RLTD R Corp*, 463 Mich 634, 635-636; 624 NW2d 725 (2001), citing *RLTD R Corp v Surface Transportation Bd*, 166 F3d 808, 810-811 (CA 6, 1999). It refers to removal of a rail line from the national transportation system. *Nat'l Ass'n of Reversionary Prop Owners v Surface Transportation Bd*, 332 US App DC 325, 327; 158 F3d 135 (1998) *(NARPO)*, citing *Preseault v Interstate Commerce Comm*, 494 US 1, 5-6 n 3; 110 S Ct 914; 108 L Ed 2d 1 (1990) (unanimous).

Under the federal Transportation Act,[3] a rail carrier may not remove a rail line from national service until it obtains a certificate of abandonment from the ICC. 49 USC 10903(a)(1)(B). *Hayfield N R Co v Chicago & N W Transportation Co*, 467 US 622, 628; 104 S Ct 2610; 81 L Ed 2d 527 (1984) (unanimous). The certificate verifies that future public convenience and necessity will accommodate cessation of the company's rail service on the line. *Id*. It reflects the ICC's determination that the line is no longer needed for interstate rail service. *Railroad*

---

[3] Transportation Act of 1920, ch 91, § 402(18)-(22), 41 Stat 477-478, recodified at 49 USC 10903(a) (1976 ed, Supp III).

*Ventures, Inc v Surface Transportation Bd*, 299 F3d 523, 531 n 4 (CA 6, 2002), citing *Preseault* at 6 n 3.

Years ago, the ICC developed a mechanism to retain jurisdiction over a rail line if a carrier did not realize its stated intent to abandon the line. It imposed conditions on its issuance of a certificate of abandonment,[4] maintaining jurisdiction over the rail line until the conditions were met. *Preseault* at 8. A line no longer in use, but not officially abandoned, could be reactivated later. In the meantime, it was termed "discontinued." *NARPO* at 328.

In this case, the Soo Line sought, and in 1982 was issued, a certificate of abandonment. It expressly stated:

> 1. This certificate and decision is effective October 1, 1982. . . .
>
> 2. If the authority granted by this certificate and decision is exercised, Soo Line shall advise this Commission in writing, immediately after abandonment of the line of railroad, of the date on which the abandonment actually took place.
>
> 3. If the authority granted in this certificate and decision is not exercised within one year from its effective date, it shall be of no further force and effect. [ICC Certificate and Decision, *Soo Line Railroad Company*, Docket No. AB-57 (Sub-No. 7) (Decided September 29, 1982).]

---

[4] The ICC could even impose postabandonment conditions. *Hayfield* at 633.

The majority erroneously states that the "Soo Line followed the procedures necessary to abandon" the rail line. *Ante* at 34. The record in this case contains nothing showing that the Soo Line ever advised the ICC that it had completed abandonment as the certificate explicitly required. It appears that no notice of consummation was filed with the ICC or the STB.[5] Consequently, in 1983, a year after the certificate was issued, the abandonment authorization would have expired. The rail line cannot be

---

[5] As early as 1980, an ICC Notice of Final Rules and Exemptions made clear that the ICC retains jurisdiction of a rail line for which the notification of abandonment has not been submitted. 363 ICC 132, n 2 (1980). For a period in the mid-1980s, the ICC did not require the notice of consummation of abandonment. This period was after the abandonment certificate in this case expired. Also, the ICC later reinstated and codified the requirement to eliminate uncertainty over whether a line has been abandoned and is no longer under the jurisdiction of the ICC. This served to preclude a rail carrier from holding a track indefinitely in an uncertain status. *Becker v Surface Transportation Bd,* 328 US App DC 5; 132 F3d 60, 61 n 2, 63 n 4 (1997). See 49 CFR 1152.24(f), 1152.29(e)(2), 1152.50(e).

abandoned without a new proceeding.   49 CFR 1152.29(e)(2);[6] *NARPO* at 329 n 7.[7]

Moreover, defendant may not divest the ICC of its jurisdiction over the rail line through a collateral state court proceeding.   *Phillips Co v Southern Pacific R Corp*, 902 F Supp 1310, 1317 (D Colo, 1995).   ICC jurisdiction over a rail line precludes a state court from making a finding that a state property law interest has been extinguished by evidence of abandonment. *Preseault* at 8.

Therefore, it appears that this Court lacks jurisdiction to find that the Soo Line abandoned its easement.

### Even If The Soo Line Abandoned The Rail Line, It Did Not Abandon The Easement

However, the majority is unpersuaded and finds that the Soo Line did abandon the easement.   I believe that, even if the Soo Line consummated abandonment of the rail

---

[6] The majority asserts that I rely "First and foremost" on this provision. *Ante* at 41.   Actually, I rely primarily on the explicit terms of the certificate issued to the Soo Line.   I cite the regulation to substantiate my conclusion that, because the authorization to abandon granted to the Soo Line appears to have lapsed, a new proceeding is required.

[7] I note that the federal railbanking program was but a glimmer in Congress's eye when the STB issued its certificate of abandonment to the Soo Line in 1982.   The Soo Line could not have used this program at that time because it did not exist.

line with the ICC, it did not abandon the easement on which the line was built.

Abandonment, like the scope of an easement, is a question of fact. *McMorran Milling Co v Pere Marquette R Co*, 210 Mich 381, 391, 393-394; 178 NW 274 (1920). Whether it has occurred is determined by the actions of the parties. *Van Slooten v Larsen,* 410 Mich 21, 50; 299 NW2d 704 (1980), app dis sub nom *Craig v Bickel*, 455 US 901 (1982).

Congress has made clear that use of a rail line as a recreational trail after the issuance of a certificate of abandonment should not be equated with abandonment of the easement. The ICC's regulatory authority over rail corridors includes conserving them for future use for commerce and for current use as recreational trails. The Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act)[8]

> provided for mandatory transfers of corridors proposed for abandonment to other carriers, and directed the ICC to impose conditions barring the disposition of railroad rights-of-way for 180 days in order to allow for possible transfers for public use, including for trails. [H R Subcomm on Com and Admin L of the Jud Comm, *Litigation and Its Effect on the Rail-to-Trails Program*, 107th Cong at 57 (June 20, 2002) (statement of

---

[8] Pub L 94-210, 90 Stat 144, as amended, 49 USC 10906 (1982 ed).

**9**

> Andrea Ferster, General Counsel, Rails-to-Trails
> Conservancy).]

See *Preseault* at 5-6.

The Rails-to-Trails Act[9] gave the ICC oversight authority in the conversion of railroad rights-of-way to recreational trails when a rail carrier seeks permission from the ICC to cease service. *Id.* at 59-60. This authority extends to rights-of-way that are not in use for railroad transportation. *Preseault* at 6; *Caldwell v United States*, 391 F3d 1226, 1229-1230 (CA Fed Cir, 2004).

The United States Supreme Court has stated that, when a railroad company "abandons" a line, it does nothing more than divest the ICC of authority over the line. The Court said that Congress intended, when writing the act,

> that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trail use will be considered prior to abandonment. [*Preseault* at 8, citing H R Rep No. 98-28, pp 8-9 (1983); S Rep No. 98-1, p 9 (1983).]

---

[9] National Trails System Act Amendments of 1983, Pub L 98-11, § 208, 97 Stat 42, 48 (1983) (codified as amended at 16 USC 1247(d) (Supp II, 1996).

The Court opined that every rail line is "a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable." *Preseault* at 19. Thus, rail-to-trail conversions do not constitute abandonment of a property right under state law, even if the easement was specifically created for railroad purposes only. *Preseault* at 8.[10]

The majority states that the Rails-to-Trails Act requires a railroad company to "bank" its right-of-way in order to preserve its property interest. This is untrue. *Buffalo Twp v Jones*, 571 Pa 637, 651; 813 A2d 659 (2002), cert den *Jones v Buffalo Twp*, 540 US 821 (2003). Authorization by the ICC to put a railway right-of-way into interim use as a trail is not required as a matter of law.

---

[10] Accordingly, courts have not considered the ICC's certification of a railroad company's abandonment of a line as evidence that the company abandoned its easement. See *Rail Abandonments–Use of Rights-of-Way as Trails; Rail Abandonments–Use of Rights-of-Way as Trails–Supplemental Trail Act Procedures*, 5 ICC 2d 370, 3 (1989) ("Once a carrier exercises the authority granted in a regular abandonment certificate the line is no longer part of the national transportation system."); *Barney v Burlington N R Co, Inc,* 490 NW2d 726, 729, 730 (SD, 1992), cert den sub nom *Kaubisch v South Dakota*, 507 US 914 (1993); *Chevy Chase Land Co v United States*, 355 Md 110, 169-171; 733 A2d 1055 (1999), cert den 531 US 957 (2000); *State of Minnesota, by Washington Wildlife Preservation, Inc v Minnesota*, 329 NW2d 543, 548 (Minn, 1983), cert den 463 US 1209 (1983).

*Citizens Against Rails-to-Trails v Surface Transportation Bd*, 347 US App DC 382, 391; 267 F3d 1144 (2001); *Southern Pacific Transportation Co—Exemption—Abandonment of Service in San Mateo Co, Ca*, 1991 WL 108272 (ICC, 1991).

THERE IS ABUNDANT EVIDENCE THAT THE
SOO LINE DID NOT ABANDON THE EASEMENT

The trial court found that the Soo Line had no intent to give up its easement. Because there was ample evidence supporting this ruling, it was not clearly erroneous.

The Soo Line did not immediately remove its tracks. They remained in place on this parcel at least through 1986 when it was appraised. Some of the tracks remain today, as do other structures elsewhere on the right-of-way, such as bridges.

The facts of the *Belka v Penn Central Corp*[11] decision cited by the majority, and *Becker*, contrast with the facts in this case. In *Belka,* the transportation corridor was no longer intact. The land had been broken into segments that could not be restored for future rail service. *Belka* at 18-19.

In contrast, the right of way in this case remained a viable transportation corridor in use by recreational

---

[11] 1993 US Dist LEXIS 15836 (WD Mich, 1993) (unpublished), aff'd without opinion 74 F3d 1240 (CA 6, 1996).

**12**

vehicles until defendant erected its fence.  Although its path may have been difficult for some to identify during the litigation, *ante* at 7, it is without question that plaintiff identified and maintained it as a corridor for recreational vehicles.

In *Becker*, the rail carrier refused to negotiate to sell the rail line.  It preferred to walk away from its property interest.  The Soo Line's conduct, on the other hand, demonstrates an intent not to abandon its property interest in the right-of-way.  Three years after filing its notice of abandonment with the ICC, the Soo Line sold a utility easement over the land to the Michigan Bell Telephone Company.

In other cases, perhaps in this one, a rail line would file a notice of abandonment with the ICC as a first step in obtaining financial assistance.  The intent might be to secure a means of maintaining operation rather than abandoning it.  *Chevy Chase Land Co v United States*, 355 Md 110, 172-173; 733 A2d 1055 (1999).

Intent to abandon is ascertained by examining the totality of the circumstances.[12]  The Soo Line stopped using

---

[12] In *Glosemeyer v United States*, 45 Fed Cl 771 (2000), the United States Court of Federal Claims held that an application to the ICC for authority to abandon was clear evidence of intent to abandon an easement only if

the right-of-way for a period in this case.  However, that may not have signified an intent to abandon it.  *McMorran* at 394.  Ceasing operation, removing track, and canceling tariffs are consistent with an intent to retain the right to resume service.  *Becker* at 62, quoting *Birt v Surface Transportation Bd,* 319 US App DC 357, 362-363; 90 F3d 580 (1996).  See also *Strong v Detroit & M R Co,* 167 Mich App 562, 569; 423 NW2d 266 (1988).  More is needed in order to conclusively prove an intent to abandon a property right.  That evidence is lacking here.  Because there was ample evidence supporting the trial court's factual findings, they should be upheld.

THE EASEMENT WAS NOT PERPETUALLY RESTRICTED TO USE AS A RAIL LINE

Even if the Soo Line retained its property interest in the easement until conveying it to plaintiff, the easement cannot be used for a trail unless its scope includes trails.  The majority finds that the easement was for railroad purposes only.  It is incorrect.

Where an easement is granted and the scope of its use is in question, we attempt to discern the parties' intent.  Intent is determined by applying principles similar to

---

"confirmed by conduct."  *Id.* at 777.  The Pennsylvania Supreme Court has also held that filing a certificate "must be coupled with external acts in furtherance of abandonment."  *Buffalo Twp v Jones*, 571 Pa 637, 647; 813 A2d 659 (2002).

**14**

those used when contracts are construed. 1 Restatement Property, 3d, § 4.1, comment *d*, p 499. First, the terms of the conveyance itself are examined. *Epworth* at 575; *Quinn v Pere Marquette R Co,* 256 Mich 143, 150; 239 NW 376 (1931).

In this case, the conveyance was by deed. Under its terms, Quincy gave Mineral Range and "its successors and assigns forever a right of way for the railroad of" Mineral Range. It later stated that Mineral Range would have and hold the strip of land "for the purpose and uses above stated . . . ."

This Court has held that such a statement of purpose in a conveyance for a railroad does not mean that the land can be used only for a railroad. In *Quinn,* a warranty deed conveyed a parcel "'to be used for railroad purposes only.'" *Id.* at 146. Like the deed in this case, the deed in *Quinn* did not contain a reverter clause. After considering the circumstances surrounding the conveyance, the Court concluded that the statement in the deed was merely a declaration of the purpose of the grant. It did not prevent the right-of-way from being used later for other purposes. *Id.* at 151. Accord 65 Am Jur 2d, Railroads, § 61, p 248, and § 68, p 252.

By contrast, a right-of-way can be limited to use only for a railroad where it is explicitly stated in the conveyance. In *Epworth, supra* at 568*,* the deed to the railroad recited that the parcel was "'to be used for railroad purposes only.'" It continued, "If, for any reason, the property . . . shall . . . cease to be used for railroad purposes and trains shall not be run over the railroad track," then the property reverts to the grantor. *Id.* at 573. In that case, the Court held that the parties clearly intended the property never to be used for anything other than a railroad.

These principles apply also to deeds creating easements. In *Hickox v Chicago & C S R Co*,[13] the deed for a right-of-way stated that if the property ceased "'to be used and operated as a railroad . . . then . . . the right-of-way . . . shall terminate.'" *Id.* at 619. The Court held that the land had to be used to operate a railway, even though it was not limited to running trains, or the easement ceased. *Id.* at 620-621.[14]

---

[13] 78 Mich 615; 44 NW 143 (1889).

[14] See also *MacLeod v Hamilton*, 254 Mich 653; 236 NW 912 (1931). In that case, a right-of-way to build a drain was granted "'for no other purpose whatever . . . .'" *Id.* at 656. When it ceased to be used for a drain, the right-of-way ceased to exist. *Id.* at 656-657. Contrary to the

It is not uncommon for a deed creating an easement to describe the scope of the easement in general terms. When a controversy over scope of usage arises, it falls to courts to determine whether the parties intended to allow the land to be put to uses not specified in the deed. 1 Restatement Property, 3d, § 4.1, comment *b*, pp 498-499.

As a general statement, the easement holder is said to enjoy all rights reasonably necessary and proper to fully use the easement. *Unverzagt v Miller,* 306 Mich 260, 265; 10 NW2d 849 (1943), citing 9 RCL, p 784; 1 Restatement Property, 3d, § 4.10, p 592; 5 Restatement Property, § 450, comment *e*, pp 2904-2905.

If the wording in a deed is not definitive, we infer from the circumstances surrounding the conveyance what unspecified uses the parties intended to allow. *Newaygo Mfg Co v Chicago & W M R Co,* 64 Mich 114, 122-123; 30 NW 910 (1887); 1 Restatement Property, 3d, § 4.10, comment *a*, p 592, and comment *d*, p 595. We bear in mind that easements are permanent rights. 1 Restatement Property, 3d, § 4.1, comment *b*, p 498. Also, the rights of the easement holder are superior to those of the owner in fee

---

majority's assertion, before today's decision, this Court has consistently applied these principles both to deeds for fee simple interests and to easement interests. *Ante* at 27.

simple. *Cantieny v Friebe*, 341 Mich 143, 146; 67 NW2d 102 (1954), quoting *Hasselbring v Koepke*, 263 Mich 466, 475; 248 NW 869 (1933), quoting *Harvey v Crane,* 85 Mich 316, 322; 48 NW 582 (1891), citing *Herman v Roberts,* 119 NY 37; 23 NE 442 (1890), *East Tennessee, V & G R Co v Telford's Executors,* 89 Tenn 293; 14 SW 776 (1890), and *Kansas C R Co v Allen,* 22 Kan 285 (1879).

We infer also that the parties intended that the permitted use of an easement will change over time absent language to the contrary in the deed. This inference effectuates the intent, which we presume the parties entertained, that the right-of-way remain viable. 1 Restatement Property, 3d, § 4.10, p 592.

In this case, the deed created a right-of-way for a transportation corridor, a kind of highway available for public use. See Elliott on Roads and Streets, § 1, *Marthens v B & O R Co,* 170 W Va 33, 38; 289 SE2d 706 (1982), citing *Eckington & Soldiers' Home R Co v McDevitt,* 191 US 103; 24 S Ct 36; 48 L Ed 112 (1903), and *United States v Trans-Missouri Freight Ass'n,* 166 US 290; 17 S Ct 540; 41 L Ed 1007 (1897).[15] The deed assigned the right-of-

---

[15] Thus, it would have been redundant for the parties to describe the easement as both a right-of-way and as a transportation corridor, as the majority seems to require. *Ante* at 26 n 44.

way "forever," thus creating a permanent interest.  Its initial purpose was to permit the Mineral Range Railroad to build and run a railroad artery.  It contains no defeasance or reverter language suggesting that the parties intended to forever limit the use of the right-of-way to a railroad.

The parties had to know that easements are transferable and binding on subsequent owners.  The fact that they used broad language suggests that they intended to create a corridor that over time might accommodate modes of transportation other than railroads.[16]  Thus, I would hold that this deed created a right-of-way that the parties intended not to limit to a railroad.[17]  It was not extinguished as a matter of law when it ceased to be used for railroad purposes.

PLAINTIFF'S RIGHT-OF-WAY MAY BE USED AS A RECREATIONAL TRAIL

This Court has held that, where broad language in an easement permits uses not stated, those uses must not

---

[16] This is similar to the concept that a right-of-way for a road to be used by horse-drawn buggies might later be used by automobiles.  "[A]n easement holder may utilize such technological improvements as are reasonably necessary to carry out the purpose of the grant . . . ."  25 Am Jur 2d, Easements and Licenses, § 76, p 575 (2004).

[17] Defendant likely understood this at the time it acquired the servient estate.  It did not object later when the Soo Line granted a utility easement in the right-of-way.  Nor did it object during the first nine years that plaintiff used the right-of-way as a recreational trail.

impose an additional or increased burden on the servient estate. *Crew's Die Casting Corp v Davidow,* 369 Mich 541, 546; 120 NW2d 238 (1963), quoting *Delaney v Pond,* 350 Mich 685, 687; 86 NW2d 816 (1957). Use for recreational travel may include foot travel, bicycles, horses, and recreational vehicles. All have been adjudged to be within the scope of a right-of-way. See *WWP, supra.*

Uses of a right-of-way interfere with the enjoyment of servient estates to varying degrees. With respect to recreational uses, hikers, equestrians, and bicyclists pose little interference. Snowmobiles and other off-road vehicles are more intrusive. But the most intrusive of recreational vehicles is less intrusive than trains. Trains may travel all hours of the day or night.

Defendant's argument that the easement is more heavily used as a recreational trail than it was as a railroad misunderstands the scope of the easement. Defendant assumes that trains may run intermittently merely because that had been the custom. However, the easement here put no restrictions on the scheduling of Mineral Range's trains. They could have run incessantly and still been within the scope of the easement.

Trains are loud and cause damaging vibration. Snowmobiles and recreational vehicles are less noisy and

cause less vibration. Also, they are used on a seasonal basis. Other remedies are available to address problems associated with excessive speed or traffic volume on a recreational trail, such as speed limits and permit requirements.

Trains have at least as great a capacity as have recreational vehicles to serve as a means of transportation for lawbreakers. Trains can be boarded or departed from at locations where they must pass slowly. This case involves such a location, in a town near a bridge. A public recreational trail represents no greater safety hazard to adjacent landowners than trains that vagrants ride. Trains do not impose a substantially different burden on adjacent landowners than highways or harbors. Hence, recreational use of the right-of-way here does not substantially increase the burden on plaintiff's estate over its use by a railroad.

### CONCLUSION

From the record in this case, it appears that the section of the Soo Line railway corridor involved remains under the jurisdiction of the Surface Transportation Board. As a consequence, this Court is without jurisdiction to determine whether the easement on which it was built has been abandoned.

**21**

Moreover, even if the Soo Line consummated abandonment of the line through the STB's predecessor, it does not follow that it abandoned the underlying easement. The trial court made the finding based on ample evidence that it did not. The Court of Appeals agreed. I have reached the same conclusion.

In addition, I agree with the lower courts that the easement was not restricted to use for a railroad. Quincy Mining Company and the Mineral Range Railroad intended to create a perpetual easement for a right-of-way. Initially, it was for a rail line, but it was not explicitly limited to that use. Also, the deed did not provide that the property right would revert to Quincy or its successor if the railroad abandoned its line. Consequently, I would find that the parties intended to create a transportation corridor that would remain viable "forever" as the easement holder's transportation needs developed.

Today's use of the right-of-way for recreational travel is consistent with its former use as a railway. The burden on the servient estate was not increased when the change occurred. In fact, recreational travel imposes a lesser burden.

Thus, I would affirm the result of the trial court and the Court of Appeals and hold that plaintiff may use the right-of-way for its trail.

Marilyn Kelly